## No. 22774.

JOE SAM WALKER v. THE PEOPLE OF THE STATE OF COLORADO.
(458 P.2d 238)

Decided August 25, 1969. Rehearing denied September 15, 1969.

468

Francis R. Salazar, Robert L. Pitler, for plaintiff in error.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, for defendant in error.

*En Banc.*

Mr. Justice Day delivered the opinion of the Court.

This writ of error is to the trial court's denial of a motion under Colo. R. Crim. P. 35(b) to set aside the conviction of the defendant, Joe Sam Walker. He was found guilty of second degree murder in 1949 and was sentenced to a term of 80 years to life. His conviction was upheld by this court in *Walker v. People,* 126 Colo.

135, 248 P.2d 287. We will refer to that decision as first Walker.

On June 10, 1965, Walker filed a motion which is now the subject matter of this review. He alleged, among a number of contentions in his motion, that he had been denied a fair and impartial trial by reason of massive and hostile publicity concerning him and his case. The trial court denied the motion summarily on the ground that the petition on its face was not legally sufficient to entitle Walker to any relief. Walker was not given an opportunity at that time to present anything of an evidentiary nature in support of his 35(b) allegations that his constitutional rights had been violated. When Walker came to this court at that time challenging the Boulder district court's summary dismissal of the motion, the attorney general advised the court that although most of the matters asserted by Walker had either been considered and rejected by this court in first Walker, or could be summarily disposed of on the basis of the record, the allegation concerning the massive and inflammatory pre-trial publicity and whether it was such as to violate Walker's constitutional right to a fair trial, could only be resolved after a full evidentiary hearing. We thereupon in what we will refer to as second Walker (*Walker v. People,* 160 Colo. 286, 417 P.2d 14) reversed the trial court and remanded the cause with directions that Walker's allegations be considered under the ruling of *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed 2d 600.

The evidentiary hearing on remand was held, and the trial court entered findings of fact and conclusions of law but again denied Walker's motion to set aside the verdict and sentence. So now, in this the third Walker, the latest ruling of the trial court is being challenged. The main point of argument — which is the only one that we will consider — is that the trial court misapplied the rule in *Sheppard* and failed to follow the guidelines set out therein. Instead, the court applied law that has

been overruled in *Sheppard* and erroneously determined that it could not apply "present day standards of newspaper conduct to the happenings in 1949." We hold that the court erred for reasons hereinafter set out.

The facts of the case are fully set forth in the first Walker and need not be repeated here. A brief quotation from the dissenting opinion in first Walker gives an accurate picture of the problem which now commands the attention of this court:

"* * * We cannot disregard the fact that an atrocious crime was committed; that the seat of the trial was in the same community of irate citizens; and that when the finger of suspicion was pointed in defendant's direction, and when the charge was finally laid against him, all accounts thereof were fully embroidered by the press, which should be the maximum of information and the minimum of comment before trial in criminal cases. With this setting, it is easy for the gossamer thread of prejudice to be invisibly woven into the fabric of guilt through the means of an unfair and partial trial. * * * In such an atmosphere, the following expression of Robert Ingersoll is fitting, 'Prejudice is the spider of the mind, it is the womb of injustice'."

I.

A brief review of the law is necessary to bring into focus why we hold that the trial court misapplied the law and failed to follow our directions to view the facts with the *Sheppard* case in mind. Traditionally, before *Sheppard*, defendants had been required to prove a direct connection between the publicity and the alleged denial of the fair trial. See *Beck v. Washington*, 369 U.S. 541, 82 S. Ct. 955, 8 L. Ed. 2d 98; *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751. This, we are persuaded, was the test used by the trial court leading to the conclusionary comments:

"* * * While it is recognized that pre-trial publicity in the *Walker* case was extensive and contained material not admitted at trial, especially that based upon the

reports and activities of press-employed scientists, still it is difficult to compare the standards of 1948 and 1949 with those of the present day. Sheppard was denied change of venue; Walker did not request it. It is impossible to determine exactly *how and in what manner* the pre-trial publicity connected with the *Walker* trial caused *his trial to be unfair and prejudiced."* (Emphasis added.)

█ The line of cases culminating in *Sheppard* hold that the publicity in question can be so "massive, pervasive and prejudicial" that the denial of a fair trial *may be presumed. Estes v. Texas,* 381 U.S. 532, 85 S. Ct. 1628, 14 L. Ed. 2d 543; *Rideau v. Louisiana,* 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663.

██ The court, therefore, also erred in holding that a showing must be made that the jurors were actually and directly affected by the publicity. Also the court's finding that "There is no evidence that prospective jurors were contacted or publicized before the trial" is not a material element in the determination of a case such as presented herein. If it were, the court's finding of "no evidence" is contrary to the record. The jurors were considerably affected by the pre-trial publicity as will be discussed later.

█ With the conclusions of law of the trial court, which were predicated on principles no longer recognized in *Sheppard* and based on findings which were not the true test dictated by *Sheppard,* a question arises whether we should remand the case to the trial court for a re-evaluation of the record by following *Sheppard,* or, whether this court must find as a matter of law that the publicity was sufficiently prejudicial to come within the purview of *Sheppard.* We hold as a matter of law that the community was so permeated with prejudice as to deny a fair trial to Walker. A comparison of the publicity aspects of the *Sheppard case* and of the case at bar will be helpful to explain this conclusion.

The syllabus of the Supreme Court in *Sheppard* de-

scribes the publicity prior to Sheppard's arrest and subsequent to his arrest and prior to his trial as follows:

"* * * During the entire pretrial period virulent and incriminating publicity about petitioner and the murder made the case notorious, and the news media frequently aired charges and countercharges besides those for which petitioner was tried. Three months before trial he was examined for more than five hours without counsel in a televised three-day inquest conducted before an audience of several hundred spectators in a gymnasium. Over three weeks before trial the newspapers published the names and addresses of prospective jurors causing them to receive letters and telephone calls about the case. * * *"

The court further noted the following publicity:

"Throughout this period the newspapers emphasized evidence that tended to incriminate Sheppard and pointed out discrepancies in his statements to authorities. At the same time, Sheppard made many public statements to the press and wrote feature articles asserting his innocence. During the inquest on July 26, a headline in large type stated: 'Kerr [Captain of the Cleveland Police] Urges Sheppard's Arrest.' In the story, Detective McArthur 'disclosed that scientific tests at the Sheppard home have definitely established that the killer washed off a trail of blood from the murder bedroom to the downstairs section,' a circumstance casting doubt on Sheppard's account of the murder. No such evidence was produced at trial. The newspapers also delved into Sheppard's personal life. Articles stressed his extramarital love affairs for a motive for the crime. The newspapers portrayed Sheppard as a Lothario, fully explored his relationship with Susan Hayes, and named a number of other women who were allegedly involved with him. The testimony at trial never showed that Sheppard had any illicit relationships besides the one with Susan Hayes."

Editorially, it was urged that an inquest be had and later that Sheppard be arrested; newspapers played upon Sheppard's refusal to take a lie detector test and that he would not "take truth serum." Other significant details of the case are well detailed in the Supreme Court opinion and need not be given amplification. Suffice it to say that on a record surprisingly analogous to what has been presented in the case at bar, the United States Supreme Court held that "the totality of the circumstances" made it "inherently impossible for Sheppard to receive a fair trial."

Although the publicity in *Sheppard* during the weeks of trial was more damaging than what has been shown in this record, in certain other aspects the news media with relation to the *Walker* case went *far beyond Sheppard,* and in a surprising number of areas the publicity was almost identical to that in *Sheppard.*

## II.

In addition to the publicity which was prejudicial and directed at Walker, there was a prologue of publicity which focused great public attention upon the case and was bound in a preliminary sense to affect the members of the community from which the jury was to be selected. What follows immediately are some of the instances of this prefatory publicity which must be considered as a part of the whole.

Citizens were, by every conceivable psychological mass media of suggestion, urged to bring about the immediate apprehension of the killer. Fears were aroused by describing the unknown assailant as a "mad dog at large," "a fiend," "pervert," and by many other inflammatory descriptions. Under the heading "Got a Clue? Read this" the Denver Post said that clues should be turned over to certain law enforcement officers, but further added, "If local law enforcement officers cannot be reached bring possible clues to the Denver Post."

The Rocky Mountain News, in one edition, contained articles carrying the following headlines: "C.U. Vigi-

lantes Hunt Missing Murder Clues," "CU Students Form Posse To Track Co-Ed Killer," "Crack Sleuths Of 3 Counties Team To Solve Co-Ed Slaying," "University Is Aroused."

In the same Rocky Mountain News edition appeared the headlines: "The Last Hour Of Theresa Catherine Foster" which was, although fictional, illustrated by two blown up pictures of two pairs of eyes from the bridge of the nose a little past the eyebrow. Under one picture was the line: "The Innocent Eyes Of Theresa Catherine Foster." Under the other: "And Here Is How The Frenzy-Filled Eyes Of The Killer May Have Looked." Who was used for this latter photo is not revealed.

The Hail Mary prayer was interspersed throughout the article with such statements as:

"Holy Mary Mother of God pray for us sinners now and at the hour of our death."

"The timeless words moved silently perhaps upon her lips . . .

"(What dark and brutal desires lie within the hidden places of some human beings? What thoughts of perverted pleasures gnaw at the hearts of some human creatures? What terrible and godless passions lie within the bosom of some we pass perhaps upon the street?)

"He looked down upon the bruised and battered body * * *."

Three days later the Denver Post, under the by-line of the famed lawyer-fiction writer, Erle Stanley Gardner, printed an article from which we quote the following:

"We may now be dealing with a man who commits a torture murder, who deliberately tortures his victim, who revels in sadistic violence, who enjoys torture so much that he starts one method of murder only to discontinue it before it has been effective, and resorts to other means of violence.

"Or we may be dealing with some emotional amateur

who yielded to a veritable hysteria, who may have been sobbing even as he choked and strangled, struck and bludgeoned.

\* \* \*

"Somewhere in our midst this murderer is smugly hoping that public apathy will soon insure his immunity from prosecution."

That there was far from public apathy is illustrated by the following headlines: "500 Students Face Quiz In C.U. Murder," "Denver Is Searched For Slayer Of Co-Ed," "Co-Ed Slayer Suspect Is Hunted; Tries To Trade Auto In Denver." One article said: "Spurred by a $12,000 reward for information leading to the conviction of the killer, countless persons continued to deluge officers with tips today \* \* \*." Another article was headlined: "Blood Experts Swamped By Flood Of CU Clues," followed by [It was reported that every] "bloodstained rock, rag, or piece of glass within a 50-mile radius has assumed a sinister portent in the eyes of amateur and professional sleuths." "Dr. McConnell \* \* \* said that the present case has been a 'hectic' one, because of the multiple blood-stained 'clues'."

There were other stories: "Washing Auto Suspicious Act In Boulder Now," and from the article the following: "The moment a person starts to wash his car or clean out the trunk, it seems, his neighbors will inform police. Officers have checked out dozens of these 'tips' only to startle innocent persons. Most motorists, therefore, will avoid the washing and cleaning job until the killer's auto is found."

Still another article on another day read: "CU student had officers check his car so he can wash the blood out of it." It was followed by an explanation that the blood had come from the boy's dog and that he figured he might look like a suspect so he wanted the sheriff's office to check first.

The Daily Camera of Boulder, in a mild protest, de-

picted the effect of this massive hysteria prior to the actual apprehension of Walker:

"Denver newspapers are making a sideshow attraction of a Boulder tragedy. Printing half-truths, theories and playing up obscure facts that may be sensational, these newspapers are appealing to morbid curiosity, which probably sells newspapers, but is not fair to the victim, to her family, to Boulder, to the university and to justice. — HAK."

The foregoing publicity was highly prejudicial to whoever subsequently might be charged with the offense.

Illustrative of the pressure built up even before Walker's arrest was testimony at the remand hearing that on the night of Walker's arrest there were such large crowds of people in the halls that it was necessary to sneak Walker to his cell block through the back way; that mob violence was threatened; that two famed criminologists (who will be more particularly discussed later) told Walker that they had protected him from the mob.

The Denver Post reported, "The consensus was that it would be difficult for the defense to find an *unbiased jury in Boulder County,* so intense has feeling run since the bludgeoned and raped body of the coed was found on Nov. 11."

Even during routine preliminary stages, which usually are short and command little interest, an article headed "Walker Arraigned For Murder" reported that "* * * in a courtroom packed with women and teen-agers, Joe Sam Walker, 31, was arraigned on murder charges Tuesday * * *." In an article entitled "Joe Walker Given Stay to Get Lawyer" it was reported that Joe Sam Walker "appeared * * * in a crowded courtroom * * *." and that "* * * every seat was filled and many spectators stood outside and peered in at the door." Another article regarding postponement of defendant's arraignment read: "A courtroom audience of nearly 100 persons, most of them women, leaned forward tensely as the slim prisoner walked with measured tread into court * * *."

At a third continuance on arraignment it was reported that the courtroom was crowded. When a fourth continuance was granted it was reported, "A courtroom packed to overflowing was treated to one of the most vociferous legal battles — verging at times on the comic — in Boulder County history."

Other excerpts are: "* * * spectators in a jammed courtroom saw a preview of the trial to come." "The courtroom, with every seat filled * * * Crowds lined the corridor six and seven deep, making it difficult for court officials and attorneys to push through to the courtroom."

The News published a "dramatic shot" (picture) of a crowded courtroom and also mentioned that defense attorneys had obtained "a copy of Walker's confession * * *" and that Hatfield Chilson had said "* * * that statements Walker had made to his wife, who turned them over to police, *had sustained his guilt.*" (Emphasis added.) On page 24 of the same edition, a photograph was published of "a group of intense spectators and a dog (who) packed the doorway leading to the district courtroom * * *", and further stated:
"Hundreds of spectators jammed the courtroom * * *
"When noon recess was declared, many of the spectators skipped lunch so they would not lose their seats for the afternoon hearing. Many stood in the corridor within earshot but out of sight of proceedings."

The Daily Camera reported "Walker's sixth appearance" and stated:
"* * * again the courtroom was filled to capacity with more than 200 spectators. Others filled hallways after Bailiff Leo Flynn closed the courtroom doors."

The News on February 9, 1949, in reporting that the court had set bond for Walker, stated:
"The action * * * left the overflow crowd of spectators stunned * * *."

When Joe Sam Walker was released on bond, the Post on February 15, 1949, reported:
"A large crowd was on hand to watch Walker depart

from the Boulder County Courthouse. Some even crowded the clerk's office as final arrangements were being made."

On February 16, 1949, the News reported regarding Joe Sam Walker's release on bond that he and his wife "* * * ducked out of the crowd which had gathered on the street * * *."

All of the foregoing was during the preliminary stages and before Walker was tried. It is significant to note that in spite of the protestations of newspapers, the district judge found in a hearing to determine whether Walker should be kept without bail that "I think the proof is evident and the presumption great that there was a murder committed, *but the proof is not evident and the presumption not great that it was such a murder as could be punishable by a death sentence.* This defendant is entitled to the protection of the law. Bail is granted * * *."

During the time Walker was out on bond he was followed by the newspaper men everywhere he went, and there were stories such as "* * * a reporter observed them: 1. Go into a downtown building for a conference with Walker's attorneys. 2. Walk to a nearby drugstore in company of a private detective and make several telephone calls. 3. Eat dinner. 4. Make more phone calls from the drugstore. 5. Go to a liquor store and spend 20 minutes copying in a notebook brand names of whisky. Walker's first breakfast today was in the hotel dining room, the second at a cafe with the detective."

### III.

We now consider the massive publicity aimed directly at Walker and designed to prove through the press his guilt.

The Denver Post went much further than the Cleveland paper by actually injecting itself into the investigatory process. Shortly after the discovery of Theresa Foster's body the Post retained Erle Stanley Gardner, the creator of the fictional Perry Mason, to assist the

authorities in resolving the crime. From then on it was labeled, "The Case of the Shanghied Coed." Gardner's purpose, as revealed in a Post article, was as follows: "* * * I am to try to present to readers of the Denver Post the situation as it might appear to the eyes of Perry Mason, the fictional lawyer detective who has solved so many cases in my books. We are not employed to solve the case but to give the authorities any assistance within our power."

In addition, the Post retained Dr. LeMoyne Snyder, author of a "widely used textbook" on criminology, and Leonard Keeler, "Perfector of the polygraph." These men were referred to by the Post as "two internationally famous authorities on criminology." Gardner, Snyder and Keeler were so involved in the investigatory process that Gardner was able to report shortly after his arrival: "District Attorney Chilson had lunch with us and placed everything in his office at our disposal * * *." As a further example, shortly after Walker's arrest, Snyder and Keeler were permitted by the Boulder authorities to question him privately.

In *Sheppard* the Cleveland papers highly publicized the fact that Dr. Sheppard refused to take a lie detector test or to be injected with "truth serum." In the instant case Walker did undergo lie detector tests which were administered by Keeler. Keeler's conclusion that Walker's claim of innocence was false was highly publicized although the results of such tests were known at that time to be inadmissible into evidence at the trial and that no attempt would ever be made to introduce such results in the trial. The publicity was specially prejudicial because Keeler, through the newspapers and otherwise, had publicly built up an image of the infallibility of the lie detector.

It was reported in one article:
"Dr. Leonarde Keeler of Chicago said the fourth question he put to the man today was 'Did you rape the Foster girl?' 'No' Walker replied. At this point on the

paper on which three pens record the subject's reactions, Dr. Keeler showed a marked change."

From accounts of the third lie detector test by Keeler is the following:

"In a session lasting nearly three hours Tuesday night, Walker cast aside his original denial of any implication in the case and dictated an account in which he said he was knocked unconscious by Miss Foster's companion after he had picked up the two at Broadway and University Avenue on the night of Nov. 9. * * * After relating details — some known to officers and some not — the sullen prisoner agreed to undergo his third lie detector examination this morning. For four hours he answered questions put by Dr. Leonarde Keeler of Chicago * * * and Dr. LeMoyne Snyder, Lansing, Mich. criminologist. *"Dr. Keeler expressed his opinion of Walker's answers as reflected by three pens on the graph of the lie detector: "His story is untrue from the time he picked up a fellow and a girl until the time when he started to drive away with the body. * * *"* (Emphasis added.)

Although the statement of Walker was described by the district attorney as a "self-serving declaration" which he said at one time he would not introduce into evidence (it was introduced into evidence at the trial) and with the statement being discredited by the expert Keeler, the newspapers nevertheless gave the impression to the public that a confession had been obtained by such misleading headlines as: "Walker Confesses; I Hid Body Of Co-Ed," "Inconsistent Angles Seen In Confession," and by publishing stories that the district attorney had enough direct evidence, including parts of his own statement, to demand that Walker be sent to the gas chamber. The district attorney said that "* * * statements Walker had made to his wife, who turned them over to the police, had sustained his guilt."

Intimations of guilt were raised by stories that several attorneys refused to represent the suspect and quoted a Boulder attorney who first talked to the suspect as say-

ing that Walker was going to tell a story which was "vastly different from what he had been saying" and that "It's a bizarre situation."

There are other striking similarities. In *Sheppard* the Supreme Court noted that "the newspapers emphasized evidence that *tended to incriminate* Sheppard and pointed out discrepancies in his statements to authorities." The Denver Post launched a similar attack on the defendant. Walker's story was referred to a "bizarre"; statements were attributed to the district attorney to the effect that investigation was complete except for the loose ends, and that the evidence against Walker "including parts of his own signed statement" was sufficient for the prosecution to demand the death penalty. It is to be noted here that Walker's statement was exculpatory; he protested his innocence throughout; and the court was required to rule out the consideration of the death penalty because there was no direct evidence of guilt.

When Walker in his statement claimed that an unknown third party committed the murder, the Denver Post published a statement by a detective that the investigating officers are "convinced there is no such person involved." Much was made in news accounts that Walker's mother would not attend the trial and that several attorneys had refused to represent Walker. The Rocky Mountain News published a story that reported Walker had resisted arrest, which was completely untrue.

Still other analogies appeared in the comparison of the *Sheppard* case and the case at bar. Whereas the Cleveland newspapers reported in detail the reenactment by Sheppard of the tragedy in his home, the Boulder Daily Camera reported that Walker had been taken back to the scene of the crime and had "trembled as they visited the place * * * where the eighteen-year old girl was bludgeoned and strangled."

The Supreme Court noted in *Sheppard* that the newspapers had "delved into Sheppard's personal life" and

had "stressed his extra-marital love affairs" as a motive for the crime. In the instant case the Colorado newspapers emphasized the possible illegality of Walker's marriage and that his wife could probably testify against him. It purported to bare his past criminal record, which allegedly disclosed that he had molested two young girls in Oregon. This latter "evidence" was not admitted at the trial. Walker in another story was said to be suspected in the "Black Dahlia case." (This was a sensational Los Angeles murder.)

Other indications of the impact of the publicity is the following account of a statement by Mrs. Walker's employer:

" 'Some people think that because I have kept her on the job I am taking her side and Joe's', Switzer declared. 'That's not the case. The simple fact is that she is a good bookkeeper and she badly needs a job — now as well as before Joe got into trouble. But with this marriage business and everything, I'm beginning to wonder. I'm pretty disgusted.' "

When Mrs. Walker was finally fired from her job, there appeared in the Boulder newspaper, under the headline "Mrs. Eleanor Walker Loses Her Job With Switzer Electric Store" the following account:

" 'I had to let her go,' Proprietor Lyndon M. Switzer said today. 'I don't care for the type of advertising I've been getting by keeping her on. I have had enough of inquiries and criticism.'

"Switzer commented that he was commended for retaining Mrs. Walker as his bookkeeper and saleslady after she first 'turned in' her husband to police, but that the commendations have changed to condemnations since the Walkers were remarried to each other last week, ending their common-law marital relationship."

The attitude of the spectators at the trial was reported by the Denver Post: "During short recesses Walker heads for a secluded part of a corridor, lights up a ciga-

rette and smokes it * * * The crowds in the corridor eye him with apparent hostility and fall back, leaving him alone."

At the remand hearing the testimony of one of the defense attorneys was: "The jury would leave the courthouse and there were crowds on the stairs. This was in the old courthouse, and they would go between the crowd, and they would go outside to a restaurant and crowds would follow them to the restaurant and stand outside the restaurant while they ate their lunch or dinner, and just stand there while the jury ate. Very large crowds followed them, and they come back through the crowds to the jury box."

Many more analogies between the *Sheppard* case and the case at bar can be drawn. Suffice it to say that between the time Theresa Foster was found missing and the end of the trial of Joe Sam Walker, the Denver Post alone ran approximately 236 stories.

IV.

The transcript of voir dire is unfortunately in summary form, and we are therefore unable to determine the specific reasons that veniremen were excused from service. We are of the opinion that the defendant need not show specific prejudice against him through an examination of the voir dire proceedings. Compare *Sheppard v. Maxwell, supra,* with *Irvin v. Dowd, supra.* In *Dowd,* Mr. Justice Frankfurter in his concurring opinion observed:

"* * * How can fallible men and women reach a disinterested verdict based exclusively on what they heard in court *when, before they entered the jury box, their minds were saturated by press and radio for months preceding by matter designed to establish the guilt of the accused. A conviction so secured obviously constitutes a denial of due process of law in its most rudimentary conception.*" (Emphasis added.)

In *Rideau v. Louisiana, supra,* the court found it was

unnecessary to examine the transcript of the voir dire examination, stating:

"* * * we do not hesitate to hold, without pausing to examine a particularized transcript of the voir dire examination of the members of the jury, that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview'. * * *"

In the habeas corpus proceedings, *Sheppard v. Maxwell*, 231 F. Supp. 37, it was pointed out that only 14 of the 72 prospective jurors stated that they prejudged the guilt or innocence of the accused, but the United States District Court found that it had:

"* * * no compunction in finding that the publicity was so prejudicial to petitioner that the assurances of the jurors must be disregarded or in the words of Mr. Justice Frankfurter, 'before they [the jurors] entered the jury box, their minds were saturated by press and radio * * * designed to establish the guilt of the accused.' "

In the *Walker* trial 34 jurors were challenged and excused for cause; 3 were challenged and excused for favor; 25 preemptory challenges were exercised (15 by the defense and 10 by the prosecution).

In addition, one juror, G. R. Scofield, selected after exhaustion of defendant's preemptory challenges, was left on the jury despite defendant's challenge for cause and for favor. Scofield during the examination and cross examination said he wouldn't want a juror who had an "impression" like he had to serve on a case if he were being tried. He had previously stated that he had expressed an opinion as to how this case should be ultimately decided "on the basis of the newspaper stories * * *." When asked whether he felt conscious of being favorable to one side or another he answered, "I do slightly." When further questioned whether he felt any consciousness of being favorable to either the People or defendant, he answered, "I do slightly." He was asked

whether he stood impartially between the People and defendant at his time and answered, "Not entirely."

Ultimately, juror Scofield, after exhaustive questioning, was left on the jury because he stated that he would be fair and impartial and he could set aside his impressions and his pre-formed opinions. In first *Walker* we held it was not error to deny the challenge for cause, but for the purpose of illustrating the impact of the publicity we note juror Scofield's "impressions."

V.

 To sum up, we conclude that the publicity only meagerly described in this opinion was so extensive, so slanted and prejudicial, so calculated to inflame, and so all-pervasive as to posit this case within the holding of *Sheppard*. In reaching this conclusion we recognize that included in the Supreme Court's reversal of *Sheppard* was the record of the "carnival" atmosphere during the Sheppard trial. We, therefore, do not mean to imply by our conclusions that we find Walker's 1949 trial as being held in such a carnival atmosphere. The decorum of the courtroom was not lost at any time, and there was not such confusion in the courtroom that it was impossible for the court, counsel and jury to hear the testimony as was sometimes the case in *Sheppard*. Nevertheless, through the stirrings of the press Walker's trial did attract a large public following. The courtroom on all occasions was packed with members of the general public and large numbers of the press. Although during the trial the jury was insulated from outside publicity, those finally selected were not during the process of picking the jury. As has been described, the general atmosphere was charged with some undercurrent of hostility, and the jury at every recess undoubtedly was conscious of it.

Again to summarize, much of the adverse publicity was made available to the press by the law enforcement officials and their witnesses. Much of the information printed was not admissible at the trial, *e.g.*, Walker's alleged past criminal record of molesting two girls; so-

called incriminating statements made by Walker's wife to the authorities; Keeler's publicized results of the lie detector tests, etc. Noting a similar situation obtaining in *Sheppard*, the Supreme Court commented:

"* * * The prosecution repeatedly made evidence available to the news media which was never offered in the trial. Much of the 'evidence' disseminated in this fashion was clearly inadmissible. The exclusion of such evidence in court is rendered meaningless when news media make it available to the public. * * *"

The court further stated in footnote 15:

"Such 'premature disclosure and weighing of the evidence' may seriously jeopardize a defendant's right to an impartial jury. '[N]either the press nor the public had a right to be contemporaneously informed by the police or prosecuting authorities of the details of the evidence being accumulated against [Sheppard]. * * *"

In reference to a solution to this problem, the court stated:

"More specifically, the trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters, such as the refusal of Sheppard to submit to interrogation or take any lie detector tests; any statement made by Sheppard to officials; the identity of prospective witnesses or their probable testimony; any belief in guilt or innocence; or like statements concerning the merits of the case. See *State v. Van Duyne*, 43 N.J. 369, 389, 204 A.2d 841, 852 (1964), in which the court interpreted Canon 20 of the American Bar Association's Canons of Professional Ethics to prohibit such statements. Being advised of the great public interest in the case, the mass coverage of the press, and the potential prejudicial impact of publicity, the court could also have requested the appropriate city and county officials to promulgate a regulation with respect to dissemination of information about the case by their employees. * * *"

Lest this decision be characterized as so much hindsight (the trial court was without benefit of the subsequent decisions which would have illuminated the proper procedures for the judge to follow), we note the trial court could have instituted some corrective measures at the time. Counsel for Walker sought to initiate contempt proceedings against the press with no success. The trial judge even refused to hear any evidence of what was going on, though he could not have been unmindful of it as a citizen. The requests for continuances could have been and should have been granted. Again we note in *Sheppard:*

"\* \* \* But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge *should continue the case until the threat abates,* or transfer it to another county not so permeated with publicity \* \* \*." (Emphasis added.)

Our holding on the grounds that there was prejudicial publicity makes it unnecessary to comment upon the other points of argument urged in this writ of error.

The conviction and sentence of the defendant is reversed and set aside with instruction to either grant Walker a new trial or release him.

MR. JUSTICE GROVES specially concurring.

MR. JUSTICE MCWILLIAMS dissenting.

MR. JUSTICE GROVES specially concurring:

The added weight that tips the scale causing my concurrence in the majority opinion is the publicity given to the use of the polygraph — and more especially the publication of Dr. Keeler's opinion that Walker was lying when he denied guilt. This particular publicity, combined with the other matters set forth in the majority opinion, to my mind created a situation where under the rules of *Sheppard,* Walker was deprived of his constitutional right to a fair trial. If there had been no publicity with

respect to the use of the polygraph and Dr. Keeler's opinion, I would dissent.

Mr. Chief Justice McWilliams dissenting:

I respectfully dissent. In my view the instant case does not fall within the ambit of *Sheppard,* and on the contrary is distinguishable therefrom.

There are, of course, similarities between Walker and *Sheppard,* most of which have been duly chronicled in the majority opinion. However, I myself have considerable doubt as to the "massive" proportions of the pre-trial publicity in the instant case, as in my best judgment such pre-trial publicity was not nearly so "massive," or "prejudicial" for that matter, as that in *Sheppard,* and much of it occurred many months prior to trial. As concerns massiveness, I would simply point out that the Denver Post as of 1949 had a daily circulation in Boulder County of some 6,900 and the Rocky Mountain News a daily circulation in that same county of about 1,900. And the population for Boulder County in 1950, according to the Colorado Year Book for 1950, was some 48,296. Whether these circulation figures equate to "massive" pre-trial publicity which in practical effect inundated the entire community is in my mind very questionable.

But even assuming that there was massive and prejudicial pre-trial publicity, there is one very important distinction between the instant case and *Sheppard,* and that is the conduct of the trial itself. The *Sheppard* trial was characterized as being of the Roman Carnival variety, with the trial judge surrendering the courtroom to the communications media. And in this unusual setting the jury then was apparently not even sequestered during the actual trial. In contrast, Walker's trial was definitely *not* of the Roman Carnival species and this fact I believe to be conceded by the majority. Indeed this Court did itself on writ of error affirm Walker's conviction and thereby in effect — if not in so many

words — approved the general conduct of his trial. *Walker v. People*, 126 Colo. 135, 248 P.2d 287.

As I understand it, then, the majority and I do agree in one particular, at least, and that is that there is a difference between the *Sheppard* case and the instant one. However, the majority apparently deem this difference to be of no particular moment, whereas I on the contrary deem this difference to be of real significance and great import. And as I read the *Sheppard* case, the United States Supreme Court itself placed great emphasis upon the failure of the trial judge to take necessary measures during the actual trial to insure Sheppard his constitutionally guaranteed right to a fair trial. In my opinion that Court indicated quite clearly that it was *not* reversing Sheppard's conviction on the basis of pre-trial publicity alone, but was reversing primarily because of the irregularities attendant to the conduct of the trial proper. In other words, then, that which tipped the scale in the *Sheppard* case is in nowise present in the instant case, and hence my inability to fathom just how the *Sheppard* case somehow commands a reversal of Walker's conviction.

In support of my conclusion that the United States Supreme Court did not reverse Sheppard's conviction because of pre-trial publicity alone, I quote from *Sheppard v. Maxwell, supra,* as follows:

While we cannot say that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pre-trial publicity alone, the court's later rulings must be considered against the setting in which the trial was held. In the light of this background, we believe that the arrangements made by the judge with the news media caused Sheppard to be deprived of this 'judicial serenity and calm to which he was entitled.' * * * The fact is that bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially *Sheppard.* * * *"

In my view by reversing Walker's conviction on the basis of pre-trial publicity alone, which is what the majority of this Court has now done, this Court has pried open a real Pandora's box. Now, apparently, all convictions are subject to a new review to determine whether any publicity preceding a particular trial was massive and prejudicial and if we by judicial fiat say it was, then the particular conviction under consideration is summarily reversed by us on the grounds that the trial was presumptively unfair — even though as here the trial court based on competent evidence before it found to the contrary — and a new trial, if such still be possible and feasible, ensues. I for one am reluctant to go back 20 years and reverse a conviction solely on the basis of stale newspaper clippings, and in my best judgment the *Sheppard* case does not require such a result.

My analysis of the *Sheppard* case squares pretty much with that set forth in *Corbett v. Patterson*, 272 F. Supp. 602, and I subscribe to the rationale of that case. In that case appears the following:

"Petitioner apparently reads *Sheppard* as holding that where a community has been exposed to considerable prejudicial pretrial publicity, it must be presumed that his trial was not fair and impartial. We do not so read the case."

In this particular connection I would simply add that I too do not so read *Sheppard*.