**The PEOPLE of the State of Colorado, Plaintiff-Appellee,**

**v.**

**Daniel AREVALO, Defendant-Appellant.**

**No. 84CA0007.**

Colorado Court of Appeals, Div. III.

April 17, 1986.

Rehearing Denied May 15, 1986.

Certiorari Denied (Arevalo) Sept. 29, 1986.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Eric Perryman, Asst. Atty. Gen., Denver, for plaintiff-appellee.

David F. Vela, Public Defender, Claire Levy, Deputy Public Defender, Denver, for defendant-appellant.

VAN CISE, Judge.

Defendant, Daniel Arevalo, appeals from the judgment entered upon a jury verdict finding him guilty of third degree assault and knowing child abuse resulting in death. We affirm.

On December 28, 1982, Cecelia Sopher reported to a Boulder County deputy sheriff that she believed her nephew, 3-year-old Michael Manning, was missing. Sopher's sister, Elizabeth Manning, had not allowed Sopher to see or talk to Michael since October 31, 1982.

At the time Manning lived in an apartment in a housing project in Boulder with Michael, her 12-year-old daughter Tricia, and with defendant Arevalo. He had apparently moved in with Manning the previous summer.

Upon inquiry by the police, Manning claimed Michael was with friends. The police obtained a warrant and searched the premises, but did not find Michael. In the boy's bedroom, however, they found the closets empty, the mattress bare, and clothing for a small male child in bags on the bed.

The next morning Manning was served a court order to appear that afternoon in district court with Michael. She failed to produce him, and again failed to produce him in court the next morning, as ordered by the judge. She was found in contempt and jailed.

Arevalo was arrested April 11, 1983. On April 12, a body later identified as Michael Manning was discovered buried in a field in Boulder.

Prior to commencement of trial in Boulder County, Arevalo filed a motion to change venue, claiming he could not receive a fair or expeditious trial there. The parties stipulated to a change of venue to Adams County.

Jury selection began in Adams County on August 15. For reasons not pertinent to this appeal, a mistrial was declared five days later. Arevalo then filed a second motion for change of venue, which the court denied.

Jury selection began again. Prior to opening statements, Arevalo filed a third motion for change of venue, contending that massive, pervasive, and prejudicial

pre-trial publicity had contaminated the jury venire. The court denied the motion.

Two witnesses testified that they had observed Arevalo physically punishing Michael in November 1982. One friend of Arevalo's saw him slap Michael's face for urinating in his pants. Other witnesses testified they observed bruises on Michael, saw signs of neglect, and saw Manning beat her child.

Tricia Manning testified she saw Arevalo slap Michael's rear end for a lapse in his toilet training. She also saw Arevalo force Michael to drink seven to ten tall glasses of water as punishment for wetting his pants. Tricia testified Arevalo also "smacked" Michael when Michael disobeyed an order to stay on the couch. She also saw Arevalo confine Michael to his room as punishment for wandering into and playing in a drug store. On another occasion she looked through a hole in the wall between her room and Michael's room and saw Arevalo bending over Michael "telling him not to go to the bathroom in his pants." She could hear the dull sounds of hitting and Michael crying.

The physical evidence introduced at trial revealed a large red stain on the floor inside the cold air return vent in Manning's apartment. An expert in hair comparison testified that different hairs found on Michael's body and on the material with which the body was wrapped matched Arevalo's and Manning's hair. A pathologist was not able to determine the cause of death, but testified that Michael had been bruised on the right part of his buttocks and on the back of his right thigh. A mineralogist matched samples of soil from Michael's grave site to dirt from the shovel in the back of Arevalo's truck.

Two inmates at the Adams County Jail testified that Arevalo made incriminating statements while he was detained there. The testimony of the first inmate was stricken later because the prosecution knew it to be false. The second inmate, Joseph Henslik, testified that he and Arevalo had a conversation through a vent between their cells. According to Henslik,

Arevalo asked him whether Colorado recognized common law marriages and whether his wife could testify against him if she had given a written statement. He allegedly asked Henslik whether Manning would be equally as guilty as he if she had helped him bury the body. Henslik testified Arevalo admitted that he and Manning buried Michael together to insure that one could not tell on the other. Arevalo also allegedly told Henslik, "I don't know if I killed him or not because I threw the kid around a lot and she picked him up later and put him in something like a pillow case and threw him in a dryer." Henslik was not sure if Arevalo said "dryer" or "higher." Henslik also testified Arevalo called Michael a "sacrifice" and said Manning would have "cut him loose" if he had not done "something" to Michael.

Henslik said that, as a protective measure against other inmates, he told them he was going to lie under oath to get relief from charges pending against him. Also, Arevalo's defense witnesses testified that Henslik was a known liar.

The prosecution presented witnesses who testified that Elizabeth Manning had had another son, Christopher Cheesum, born in Baltimore, Maryland, in February 1974. That baby was not seen after about six months. Manning had claimed the child was admitted into Johns Hopkins Hospital with a heart murmur, pinched spinal column, and severe retardation. The parties stipulated that the records of Johns Hopkins did not reflect a Christopher Cheesum ever being admitted.

At the close of the prosecution's case, Arevalo moved for judgment of acquittal on all counts. The trial court granted the motion in part. The first degree murder count was dismissed, but the case proceeded on a criminally negligent homicide charge. The charge of child abuse resulting in death was retained. The court granted the motions for judgment of acquittal of assault in the first degree and assault in the second degree, but let the case proceed to the jury on the lesser included offense of assault in the third de-

gree. The motion for judgment of acquittal on the charge of accessory to a crime was denied, but that charge was dismissed later after the defense presented its case.

The jury returned a verdict of not guilty of criminally negligent homicide, and guilty of knowing child abuse resulting in death and third degree assault.

## I.

On appeal, Arevalo first contends the trial court erred in denying his motions for change of venue from Adams County. He argues that the community was so infected by massive, pervasive, and prejudicial pretrial publicity that he could not get a fair trial there. He also argues that the record on jury selection shows deep prejudice against him in the community.

■ A defendant has a constitutionally protected right to be tried by impartial jurors. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). A criminal case, however, will likely generate public interest, and it is not unusual for potential jurors to have heard or read something about the case, *People v. McCrary*, 190 Colo. 538, 549 P.2d 1320 (1976). It is not necessary that jurors be totally unfamiliar with the facts of the case if they are able to lay aside the information and opinions they may have received through pretrial publicity. *McCrary, supra.* "The mere existence of extensive publicity, by itself, does not trigger a due process entitlement to change of venue." *People v. Bartowsheski*, 661 P.2d 235 (Colo.1983); *People v. Thornton*, 712 P.2d 1095 (Colo.App. 1985) (*cert. granted* on other grounds January 21, 1986).

## A.

Arevalo contends the publicity was so "massive, pervasive and prejudicial" as to create a presumption that he was denied a fair trial. We do not agree.

■ It is only in rare cases that a denial of fair trial because of publicity will be presumed. The presumption has been applied in only one case in Colorado, *Walker v. People*, 169 Colo. 467, 458 P.2d 238 (1969), and the pretrial publicity in *Walker* was much greater and more vituperative than here.

■ In *Walker*, the two major Denver papers and the Boulder paper extensively covered the investigation and trial associated with the rape and murder of a University of Colorado coed. One Denver paper hired famous criminologists and the author of the "Perry Mason" books to assist in the investigation. One published pictures of how the "frenzy-filled eyes" of the killer might have looked. Prayers were interspersed through the articles. One paper inaccurately reported that the defendant Walker had confessed and that polygraph tests proved his exculpatory statements to be lies. In short, the papers' reporting amounted to an attack on Walker. Moreover, the trial judge in *Walker* refused to hear any evidence as to the press coverage.

In the instant case, the trial court made extensive findings on factors ranging from volume of coverage to publication of inadmissible facts to assess whether any presumption of prejudicial publicity precluding a fair trial existed. Those factors emerged from previous Colorado cases, including *People v. Bartowsheski, supra; People v. Botham*, 629 P.2d 589 (Colo.1981); and *People v. McCrary, supra.* A review of the newspaper articles pertaining to the instant case convinces us that the trial court was correct in its determination.

Admittedly, the Denver television stations and the two Denver newspapers carried a great deal of coverage on the incident, investigation, and trial. Some of the coverage was on the front pages. Editorials appeared discussing the case, but no juror recalled the editorials.

The coverage began close to the time of Manning's arrest in December and continued through Arevalo's trial in October. However, the articles and TV news reports most damaging to Arevalo appeared in April and May, about six months before his trial. The majority of those articles and reports contained no significant details

which were especially repulsive or disturbing, although some of the articles were poignant.

Important to our decision is the fact that information prejudicial to Arevalo came from Manning, rather than from any official source, and her credibility was extremely low. It was widely reported that years before she had another son from a previous relationship who had disappeared and has never been found. This differs even from *Botham, supra,* where, despite the publication of *police* reports, the court found no presumption of an unfair trial based on the massive publicity alone (but did reverse for a new trial based on the actual partiality of the jury panel from exposure to pretrial publicity).

Additionally, the Denver papers are papers of general circulation. The trial did not occur in the community in which the crime was committed. In contrast, in *Botham* the crime occurred in Mesa County, the trial was held there, and all the details were published in Mesa County's only daily newspaper. *A fortiori,* if there was no *presumption* of an unfair trial in *Botham,* none could exist in Arevalo's case.

### B.

If a defendant cannot show that the pretrial publicity created a presumption of an unfair trial, he may try to demonstrate that the publicity had an *actual* adverse effect upon the jury panel. *People v. McCrary, supra.* Arevalo makes that attempt here, arguing that the record of jury *voir dire* demonstrates a pattern of prejudice against him in the community resulting from the pretrial publicity. We disagree with Arevalo. The record supports the presumption that he was given a fair trial.

It would be an impossible standard for the courts to hold that jurors can have no familiarity with a case. It is sufficient if jurors can lay aside any information received and opinions formed through pretrial publicity. *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *People v. McCrary, supra.* The need for a careful evaluation of the competence of potential jurors to assess the defendant's guilt or innocence solely on the evidence admitted at trial, and the serious practical problems which arise in connection with these assessments, are sound reasons for placing great discretion in the trial court in the jury selection process. *Morgan v. People,* 624 P.2d 1331 (Colo.1981).

Here, the trial court made extensive findings of fact addressing the question of whether a connection existed between pretrial publicity and juror prejudice. It found that of the 12 jurors and two alternates accepted on the jury, one had been exposed to detailed coverage, 11 to general coverage, and 2 had not been exposed at all. No member of the final panel was objected to based on the knowledge of inadmissible evidence.

Premised upon these jurors' responses during voir dire, the trial court opined that no member of the final panel held an opinion on the case, and that 14 fair and impartial jurors were seated. The trial court was "persuaded that a fair and impartial jury has been selected." We perceive no basis to overturn that conclusion and adopt it as our own.

### C.

Arevalo also contends the trial court erroneously denied his challenges for cause to seven prospective jurors. We disagree.

According to § 16–10–103(1)(j), C.R.S. (1978 Repl.Vol. 8), a prospective juror should be dismissed if he evinces enmity or bias toward the defendant. However, a prospective juror with a previously formed or expressed opinion need not be disqualified if the court is satisfied from the examination of the juror, or from other evidence, that the juror will render an impartial verdict according to the law and the evidence submitted at trial. Since the factors of credibility and appearance which are determinative of bias are best observed at the trial court level, the ultimate decision whether to grant a challenge for cause is left to the trial court's sound discretion. *Nailor v. People,* 200 Colo. 30, 612 P.2d 79 (1980).

After a review of the record regarding Arevalo's specific concerns, we conclude the challenged jurors here did not patently demonstrate any fixed prejudgment about the case, nor did they show an unwillingness to accept and apply the principles explained by the court. As in *McCrary, supra,* the record here does not show that the jurors' prior knowledge of the case was so extensive that it would preclude them from determining defendant's guilt or innocence solely from the evidence presented at trial. Absent a gross abuse of discretion, the trial court's decision to deny a challenge for cause should not be disturbed on appeal. *See People v. Wright,* 672 P.2d 518 (Colo.1983). We find no such abuse here.

## II.

Eighteen months after Arevalo's conviction, he filed a motion for a new trial on the grounds of newly discovered evidence. Attached to the motion was a letter to a newspaper from Jack Beals, an inmate of Clear Creek County jail, in which Beals claimed prosecution witness Joseph Henslik was "paid" to lie at Arevalo's trial. Beals allegedly discovered this information in a jail conversation between himself and Henslik, and overheard by another inmate, William Cless.

After conducting an evidentiary hearing, the trial court gave as its opinion that "the trial testimony of Mr. Henslik that he had conversations with Mr. Arevalo was false in every material respect and that no such conversations took place." However, the court recognized that it was not the fact finder, and it determined that if the newly discovered evidence were presented at a new trial, it would only add to Henslik's impeachment and an acquittal would probably not result. Therefore, the trial court denied the motion for a new trial.

An appeal of that denial was consolidated with Arevalo's other grounds for appeal. He contends the trial court's opinion that the only evidence that supports Arevalo's conviction of child abuse resulting in death was false requires that Arevalo be granted a new trial. We disagree.

Quoting from *DeLuzio v. People,* 177 Colo. 389, 494 P.2d 589 (1972), Arevalo asserts that "where newly discovered evidence is of such a character as to make it appear that the verdict *could have* been influenced by false or mistaken testimony and that upon another trial the result *might be* different, then a new trial should be granted." (emphasis added). *Accord Cheatwood v. People,* 164 Colo. 334, 435 P.2d 402 (1967), and *Whipp v. People,* 78 Colo. 134, 241 P. 534 (1925).

The above cases are factually distinguishable from the instant case. *DeLuzio* and *Cheatwood* concerned situations in which the prosecution withheld evidence at trial that was later discovered and could have materially influenced the jury. In *Whipp,* the court held defendant did not have a fair opportunity at trial to refute the evidence of a key witness for the prosecution who was not known to the defense until the date of the trial, and who later proved to have testified falsely. In the present case, no evidence was withheld from Arevalo and he had several witnesses testify at trial as to Henslik's lack of credibility. Indeed, Arevalo's counsel on cross-examination brought out that Henslik himself had admitted before he testified that he was planning to lie. Furthermore, the above-quoted standard is no longer the governing standard for the granting of a new trial on the basis of newly discovered evidence.

The more recent opinions by our supreme court establish that the appropriate standard now is, as follows:

"To succeed on a motion for a new trial on this ground, the defendant should show that the evidence was discovered after the trial; that defendant and his counsel exercised diligence to discover all possible evidence favorable to the defendant prior to and during the trial; that the newly discovered evidence is material to the issues involved, and not merely cumulative or impeaching; and that on retrial the newly discovered evidence *would probably produce an acquittal.*"

*People v. Gutierrez,* 622 P.2d 547 (Colo. 1981) (emphasis supplied), quoting from *People v. Scheidt,* 187 Colo. 20, 528 P.2d 232 (1974). The trial court correctly applied this standard in denying Arevalo's new trial motion.

The first two requirements of the above test were met since Beals' and Henslik's conversation did not take place until after the trial. However, the proffered evidence fails on the last two requirements. At trial, Henslik's testimony was vigorously attacked through cross-examination and by the testimony of other witnesses. The defendant demonstrated that Henslik was to gain substantial concessions in plea bargaining for his own pending felony charges in exchange for his testimony. Henslik himself testified he had told other inmates that the statements he was going to make about Arevalo were lies. He allegedly did this because he felt he could be in danger as a "jailhouse snitch." The defense also demonstrated at trial that the jail guard Henslik claimed identified Arevalo to Henslik never did so. Additionally, several law enforcement officials testified that Henslik would say anything if it worked to his advantage. Despite this proffered evidence damaging Henslik's credibility, the jury must have chosen to believe the testimony.

We agree with the trial court's conclusion that if Beals and Cless had testified at Arevalo's trial, their testimony would only have been cumulative to the significant other evidence tending to impeach Henslik. Like the court in *Scheidt, supra,* we are not convinced that the additional impeachment testimony of two jail inmates would "probably" produce a different result on retrial. Therefore, the motion for a new trial on the ground of newly discovered evidence was properly denied.

### III.

Arevalo next contends he was erroneously tried under an information that did not include an essential element of the charged offense of knowing child abuse resulting in death because it failed to allege Arevalo's duty to act or the source of such duty. He argues that the trial court was without jurisdiction to try him since he had not been charged with a criminal offense. We disagree.

Count two of the information filed against Arevalo charged: "[O]n or about October 17 to December 30, 1982 ... DANIEL AREVALO did unlawfully, feloniously, and knowingly, and without justifiable excuse, cause and permit Michael Manning, a child under sixteen years of age to be placed in a situation that endangered said child's life and health which resulted in the death of said child...." This information is substantially in the words of § 18–6–401(1)(a), C.R.S. (1978 Repl.Vol. 8), and § 18–6–401(7)(a), C.R.S. (1985 Cum.Supp.).

■ An information framed in the words of the statute is ordinarily sufficient. *People v. Hoehl,* 193 Colo. 557, 568 P.2d 484 (1977). The trial court in the instant case had also granted Arevalo's request for a bill of particulars, so defendant was sufficiently apprised of the charges against him. *See People v. Rubanowitz,* 688 P.2d 231 (Colo.1984).

Arevalo relies on *People v. Beruman,* 638 P.2d 789 (Colo.1982) for the proposition that the information was defective because it failed to specify the source of defendant's duty. That case is inapposite. Beruman was a social services caseworker accused of second degree official misconduct and failure to respond properly to a report of suspected child abuse. The statute he was charged under made it a crime for a public servant to refrain "from performing a duty imposed upon him by law." The court held the indictment was insufficient because the caseworker was not informed what duties he had failed to perform in his job so he could prepare a defense. Section 18–6–401, C.R.S. (1978 Repl.Vol. 8), the statute at issue in the instant case, depends on no source of duty.

■ Every person has a duty to refrain from any action which causes a child to be placed in a situation which endangers the child's life and health. The statute refers to no external source of duty, and we do not believe the general assembly

intended that a duty between an adult and a child necessarily be established before a person may be charged with child abuse. The law is intended to prevent child abuse, and it applies to any person. Therefore, we also reject Arevalo's argument that the People had to present evidence of the source of Arevalo's legal obligation to Michael Manning. Nor do we find the statute to be unconstitutionally vague as applied.

### IV.

 Arevalo's final contention is that the evidence was insufficient to establish liability for felony child abuse, and the trial court erred in denying his motion for judgment of acquittal on that charge. We disagree. After a thorough review of the record, we are satisfied that at the close of the case there was evidence in the record from which reasonable jurors could have found defendant guilty beyond a reasonable doubt. *See People v. Gonzales*, 666 P.2d 123 (Colo.1983).

Judgment affirmed.

ENOCH, C.J., and KELLY, J., concur.