No. 22708.

JOHN MYLES DOLAN *v*. THE PEOPLE OF THE
STATE OF COLORADO.
(449 P.2d 828)

Decided January 27, 1969.

20

Edward H. Sherman, Public Defender in and for the City and County of Denver, for plaintiff in error.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, James F. Pamp, Assistant, for defendant in error.

*En Banc.*

*Mr. Justice Moore delivered the opinion of the Court.

In an information filed in the district court of the City and County of Denver it was alleged that on the 23rd day of November 1964 John Myles Dolan "did feloniously, wilfully, and of his premeditated malice aforethought kill and murder one Jane Wood Dolan." He entered a plea of not guilty and also a plea of not guilty by reason of insanity. The last mentioned plea was subsequently withdrawn and the action went to trial on the not guilty plea. The jury returned a verdict of guilty on the charge of first degree murder and fixed the penalty

---

*Retired Supreme Court Justice sitting under assignment by the Chief Justice under provisions of Article VI, Section 5(3) of the constitution of Colorado.

at life imprisonment in the state penitentiary. Motion for a new trial was filed and overruled, and judgment entered on the verdict.

Argument for reversal of the judgment is presented in this court under nine captions, one of which (numbered V) we will treat summarily. It reads as follows: "Defendant was Deprived of 'Effective Assistance' of Counsel." It is clearly disclosed by the brief of the public defender, who did not represent the defendant at the trial[1], that the arguments presented under this caption appear pursuant to the insistence of the defendant himself and not for the reason that counsel believes there is authority to sustain them. The contentions are that the defendant believes he was deprived of a fair trial and due process of law because:

"A. He contends in his Supplemental Motion that he had requested his counsel to subpoena certain persons, all of whom would have testified that he was not able to form the specific intent to commit the crime with which he is charged. The right to counsel means 'effective assistance' of counsel in the preparation and trial of the case. *Powell v. Alabama, supra.* Implied in his contention is the duty of responsible counsel to interview and bring into court witnesses who would support the contentions of the Defendant and testify on his behalf;

"B. He further contends that counsel accepted the first 13 jurors impaneled and challenged none of them to ascertain whether they were suitable to hear this case, all to his prejudice;

"C. That pressure was imposed upon him to plead guilty to second degree murder, as a consequence of which he abandoned his plea of insanity;

"D. That none of the instructions were objected to nor were any tendered by his then counsel."

The constitutional right to the assistance of counsel is not a guarantee against mistakes of strategy or exercise of judgment in the course of a trial as viewed through the 20-20 vision of hindsight following

the return of a verdict in a criminal case. *Torres v. People,* 159 Colo. 254, 411 P.2d 10; *Valarde v. People,* 156 Colo. 375, 399 P.2d 245. No error was committed by the trial court in connection with the above mentioned assignments.

We consider the other assignments presented in the brief of counsel for defendant, and will discuss the evidence pertinent to each argument as may be required by the claimed error under discussion. It is argued that: "The evidence was Insufficient to Support the Verdict of First Degree Murder. The People Failed to Prove Malice or the Unlawful Intent required to Support the Verdict." The basis of this argument is that the defendant was so under the influence of alcoholic drink as to be unable to form the specific intent deliberately and premeditatedly to kill. Analysis of this argument calls for an abbreviated summary of the evidence.

Lela Davidson testified that she worked at the Denver General Hospital and knew Jane Wood Dolan who also worked there. Jane's working hours were from 7:30 A.M. until 4:30 P.M. The witness saw Jane leave work at about 4:30 P.M. on November 23, 1964, and did not see her again.

Virgil Cook testified that he was driving north on Josephine street at about 4:30 in the afternoon of November 23, 1964, within a block of Fifth avenue; there was a parked car in the lefthand driving lane which appeared to be stopped to allow a passenger to alight but it started up and changed lanes to the righthand lane coming out from the curb and missing the witness' car by not more than "a paper thin edge." The witness was forced to maneuver his car to avoid hitting another vehicle parked at the righthand curb. He heard a noise from the car, first mentioned, which he described as "CARPOONG" or a "sound like he hit the curb." The witness had passed this car and stopped short of Sixth avenue and looked back to watch the action of the other driver whom he subsequently identified as

the defendant. He heard a second "CARPOONG" and thought the man hit the curb a second time. The right-hand door of the car opened and a woman's leg came out as though to get out of the car. The defendant grabbed the woman and started the car forward. "He grabbed her back in and I guess the motion of the car going forward could have caused her to get back in the car." The witness decided "to go after this man." He followed defendant and took his license number, AW 3570; pulled abreast of the car and got a good look at the defendant, and after following him in and out of traffic the car eluded him at the intersection of 17th and York street (which is the southwest corner of City Park in Denver).

Mr. Rounsavell, a radar operator for the 138th Air-craft Control Squadron, testified that at approximately 4:30 in the afternoon of November 23, 1964, he was sitting in his car in City Park talking with a friend with whom he worked; they heard a woman screaming; she was wrestling in the snow with a man; the man started to kick and punch her, knocking her down, and pro-ceeded to drag her across the snow; the witness and his companion ran toward the man yelling at him and the man thereupon let go of the woman and ran to his car; they could see blood on the woman's dress and her stockings were down around her ankles. The witness continued:

"A. He drove his car back up onto the lawn. He got out of his car and grabbed hold of her and we were just about on top of him at that time. He let loose of her and got back in his car and pulled out a .38 pistol. I imagine it was on the seat. Anyway, he grabbed a .38 pistol and pointed it at us, and his comments were — he said, 'You two get the hell out of here.' Then he told her to get the hell back in the car.

"Q. What did you do then?

"A. I got the nearest tree between him and me. She ran across the lawn. I hollered for her to follow us. He

came back up across the lawn doing an estimated forty miles an hour and he hit her with the left front fender of the car. She turned completely over in the air and hit the ground. Then, he turned around and went out of the park — out the west exit. I stopped somebody then and told him to call the police. We went over there and when we got over there, the first thing she said — she says, 'That is my husband.' She said, 'He is drunk. He is trying to kill me.' "

The statements made by deceased were admitted in evidence over the "hearsay" objection of defendant's attorney. The witness identified the defendant as the man involved in the events described above. He gave the police the license number of defendant's car which was the same as that taken by the witness Virgil Cook.

Charles E. Osgood testified that he was an employee at the City Park zoo; that at about 4:30 P.M. on November 23, 1964, he noticed a car over on the grass of the park; that a couple were scuffling on the snow; that he called to them to get the car off the grass; that they didn't pay any attention. He continued: "Then, this man dragged the girl or woman over to the car and tried to get her in and she broke away." The man got in his car and drove around, speeding up towards the woman. "I saw him hit something * * *. She somersaulted and went completely over the hood of the car." The witness got in his car and drove

"Over there and there was this woman on the ground. I don't remember which side she had blood on her. There was two young fellows there. I went back to the Bird House where the phone was. I was the only one that had a key and we called the police. By the time I got out, the place was swarming with them."

J. W. Horn, a police officer, testified that at 8:45 P.M. on November 23, 1964, he saw the car, which had been described over police radio, in the Denargo Market; he and his partner turned on the police car lights and followed the defendant for about three blocks into a

barricade across the 23rd street viaduct which had been closed; the defendant turned about and making a quick turn drove past the police car. The officer fired four shots but the defendant kept on going until he was stopped three blocks away by another car which blocked an intersection. Thereupon the defendant was arrested. Officers found a .38 caliber revolver on the front seat of defendant's car. The gun contained four live rounds of ammunition. In response to a question concerning the driving of the car by defendant, the witness said, "The only thing that I would say is that he wouldn't stop when we had the red light on. So far as his driving, it wasn't — well, it was normal driving. He wasn't swerving or anything like that."

Dr. Ogura testified that the death of Jane Wood Dolan was caused by a bullet which entered the back shoulder on the right side, coursed downward through the right lung, through the diaphragm, the liver, the various segments of the small and large intestines, the bladder, and was ultimately imbedded in the pubic bone. Another witness, a ballistics expert, stated that the bullet recovered from the body was fired from the defendant's .38 caliber revolver. He further testified that there were blood stains on the right side of the front seat of the automobile. Other witnesses testified concerning the condition of the victim as she was found in City Park and the circumstances under which she was taken by ambulance to the Denver General Hospital. Photographs showing car tracks in the snow on the grass portion of the park where the defendant drove into the victim were admitted in evidence.

A stipulation was entered into between counsel in which it was admitted that a divorce action had been filed by deceased in the district court of Denver on November 13, 1964, and that the defendant had been served with summons and copy of the complaint in that action.

Phillip Mellow, a probation officer for the Denver

District Court, testified that he was acquainted with the deceased in her lifetime and that at about 5:30 P.M. on November 23, 1964, he went to the hospital and talked to her. He went there with Mr. Dillon who was the Chief Probation Officer and father of the deceased, and Mr. Yurko. Before the witness Mellow was permitted to testify the court in chambers inquired into the circumstances surrounding the conversation between the witness and the deceased to determine whether her statements would be admissible as a dying declaration. The witness testified:

"I asked her, 'What happened, Jane?' She replied, 'John shot me.' Then, she lay there with her eyes wide open. She said, 'I am not going to make it this time.' She closed her eyes and the minute she closed her eyes, these doctors rushed up and started applying stethoscopes and pulling back the sheets. I stepped back. I didn't have any further conversation with her."

There was evidence that at the time these statements were made she was in "complete control of her mental faculties." Immediately after this conversation the deceased was taken into the operating room. The witness, in response to a question asked on cross-examination, stated:

"I think it was approximately an hour before they came down and notified Mr. Dillon and myself that she was dead. It must have been about 6:30."

The trial court admitted the testimony hereinabove quoted, over the objection of counsel who argued that the essentials to admission of a dying declaration had not been met. Thereupon the people rested and the defendant moved to dismiss on the ground that there was no competent evidence of any kind "establishing the guilt of this defendant," and upon the further ground that venue had not been established. The motion was denied.

At the beginning of the defendant's case his attorney offered in evidence Exhibit 1 which purported

to be the defendant's hospital record from the United States Naval Psychiatric Hospital relating back to the year 1945 when he was discharged from the U.S. Navy. Prior to the date of trial the court had granted a motion of defendant allowing him to procure from the Secretary of the Navy this record pertaining to his induction into the navy, his discharge therefrom, and a portion of his medical history contained therein. Nothing in the court's order with regard thereto related to the admissibility in evidence of anything contained in this record.

The district attorney objected to admission of this exhibit on the ground that it was hearsay; that no foundation of any kind had been offered for its admission; that no one was called to testify that the record was genuine; and that it was not even a certified copy of the alleged record held by the Secretary of the Navy in Washington, D.C. The trial court refused to admit the exhibit thus offered. It is clear that no error was committed in this connection. *Garrison v. People,* 158 Colo. 348, 408 P.2d 60; *Carter v. People,* 119 Colo. 342, 204 P.2d 147.

The defendant took the stand in his own defense. His testimony will now be summarized. He stated that on the morning of the killing, after a night during which he had trouble sleeping, he was very nervous and called the sheriff's office where he worked and was granted the day off; that he took some librium as was his usual custom when he was upset; that he started drinking at about 8:30 A.M. and continued drinking until his pint of whiskey was gone; that after drinking the pint of liquor he visited "three or four beer joints," where he had more drinks; that he picked up the deceased at about 4:00 P.M. at the Denver General Hospital, that she told him she was not going on an airplane trip, showed him a ticket and said that she had to "exchange the ticket back because I'm not going to use it"; that then "it came to my mind to take her to the airport." He

stated that he cannot recall what he did or what route he took from the hospital. He testified,

"In fact, I don't even know what entrance I left from the hospital * * * The next thing I'm aware of was her hollering at me and she had her hand on mine and I had a gun in my hand."

She said, "don't shoot yourself, John. Don't shoot yourself," and then "the bullet went through the windshield of the car and I got angry at her for that." He continued: "The next thing I can recall is we were in the park, but I thought it was the park right across from West High School * * *." He thought he was driving slow and she said, "John, I am hurt. You will have to get me to the hospital."

"So I stopped the car and while I was stopped, she raised up and took off what I think you would call a 'panty-girdle' or something like that. Anyhow, she took this off and she threw this in the back seat and she opened the door of the car and jumped out and started to run.

"Well, she was always kind of high-strung and nervous and she done things like that. So, I don't even know what is the matter with her and I stopped the car and I got out. I went around the car and started after her so I could try to get her back in the car and determine what was the matter with her and do what was needed to be done and I got up to her once and when I got up to her, she fell down and laid rigid and I had been drinking so much, I guess I tried to pick her up and I couldn't, so I headed back towards my car to get the car to go and get her and pick her up and then I seen a white fellow and a colored fellow about half again the distance of this courtroom coming towards me.

"As I reached into the car to get into the car, they turned around and run back. They run away from me. I didn't pay them any more mind because I was going to try to get her.

"So, I got in the car and I started towards where I

thought she was, and I got on the grass and I see her running towards me and she is so close, I couldn't stop. So, I swerved the car and she run and her momentum carred her into the side of the car and it knocked her back over it — not a complete turn but just over."

The defendant stated that he remembered very little thereafter but recalls being blocked by a barricade and someone calling, "Hey, you stop." He saw no red lights and heard no sirens. He said, "I intended to get over to some light by a beer joint there in case it was a robbery so that I would be close by people * * *," when a car blocked his path and he stopped and was arrested. A "breathalizer" test was taken after his arrest. He said that he did not shoot his gun at his wife, that he only remembers one shot that went through the windshield. He stated that he was given a medical discharge from the navy in 1945 and the reason given was "anxiety neurosis." He drank a lot and he usually would drink until "I just passed out." He started taking librium at the suggestion of his wife, the deceased, and it seemed to help steady his nerves. He saw his wife four or five times from November 10 to November 23.

On cross-examination he stated that his gun had six bullets in it before he saw his wife. He doesn't know how it got in his hand from under the seat where he kept it in the car. He denied trying to run over her in the park, and also denied trying to force her back into the car. He denied pointing the gun at the two witnesses who saw him in the park, and denied ordering them to "get the hell out of here." He stated that the deceased ran into the side of his car, and that she was running towards the car, not away from it. The following testimony was given:

"Q. Getting back to the park, Mr. Dolan, if you were trying to assist your wife into the car to get her to the hospital, how do you account for her screams for help? "A. I didn't hear her scream for help."

The defendant further testified:

"Q. Mr. Dolan, after you left the park how much did you have to drink?

"A. To the best of my recollection, nothing."

The mother of defendant was called as a witness for him and testified that he would drink "very hard for two or three months and then he would get over it." His father and brother were heavy drinkers. She never heard the defendant threaten suicide, or threaten anybody.

Luella Guinn, a nurse's aide at Denver General Hospital, testified that she was on duty when the deceased was brought into the emergency room; that she "cut her clothes off"; and that she heard a conversation between Jane and her father. She testified:

"A. Her father was in there and he asked her — he says, 'How are you, Baby?' She says, 'I am fine, Daddy.' So, he said, 'What happened?' She said, 'He made me do it, Daddy.' He says, 'Where were you?' She says, 'In City Park, but I am going to be okay.' That was it. That was the only conversation."

She later testified that the quoted statements "might not be word for word but that was the essence of it." At the time she heard these statements the patient was being prepared for surgery.

Lois Whitehead testified that her husband was a friend of the defendant; that she had known the defendant for four years, and he was an "extremely heavy drinker." She saw him the day before the killing and he had been drinking and was "upset." Two days prior to the events resulting in the homicide she gave him 12 to 18 capsules of ten-milligram librium and some thorazine capsules. He took some of them on the day she gave them to him. When he was drinking "he didn't know what he was doing."

Dr. Hilton was called as a defense witness but gave no material testimony except to say that a blood analysis showing .17 alcohol indicated that the person from whom the sample was taken was intoxicated, and that if librium

were taken in connection with alcohol it would have an "additive effect" of depression. There was evidence that the breathalizer test given at 9:40 P.M. showed .17 percent of alcohol by weight.

Called on rebuttal the witness Rossi testified that he was acquainted with the defendant and saw him in his "Denargo Grill" around "5:30 or 6:00 o'clock" on the date of the homicide. Pertinent testimony was as follows:

"Q. Would you please describe to the Court and Jury what took place in your establishment about that time concerning the defendant?

"A. He came in and wanted a shot of whiskey. When I poured it, he picked it up nervously and drank it and ordered another one and chased it down with a small beer.

"Q. Did he drink the second one?

"A. Yes. He did.

"Q. Had you observed him many times previously, Mr. Rossi?

"A. Yes. I had.

"Q. You did have occasion to observe him on the evening in question?

"A. I sure did.

"Q. How would you describe his condition on November 23rd when you saw him?

"A. Sort of nervous or tired or something. Just shook up.

"Q. Did he appear to be intoxicated?

"A. No, sir."

Mr. Trujillo testified that on the date involved he was a probation officer and went to the Denver General Hospital around 5:30 P.M. when he saw Jane Dolan. At first there were two men dressed in white, a nurse's aide and himself in the emergency room, and then Frank Dillon, Mr. Mellow, and Mr. Yurko came in. The witness talked with the patient. Her voice was weak, but audible. You could understand it, and she was conscious. He heard no statement by Mrs. Dolan that she was "going to get better."

The father of the deceased testified that he saw Mr. Mellow and Mr. Yurko talk with Jane Dolan at the hospital emergency room as she was being prepared for surgery. He himself talked to her. He testified that she was conscious and said to him, "Dad, I am going to die tonight," and that she said,

"John forced me into the car."

"Q. At any time that night did she tell you she was going to get better?

"A. No. She told me twice that she was going to die."

## QUESTIONS TO BE DETERMINED

First. *Was there sufficient competent evidence to warrant submission to the jury the question of defendant's guilt of first degree murder?*

 This question is answered in the affirmative. For reasons hereinafter discussed the statements of the victim made at City Park, as well as those made at the hospital, were properly received in evidence. It is sufficient to say that all the evidence pertinent to the defense of voluntary drunkenness negating defendant's ability to form the deliberate and premeditated intent to kill, presented a question of fact for determination by the jury. As appears from the abbreviated analysis of the testimony above set forth, there is an abundance of evidence supporting the verdict. Upon this point we direct attention to *Smith v. People,* 120 Colo. 39, 206 P.2d 826, from which we quote the following:

"While the defendant was to some extent under the influence of intoxicating liquor, there is ample evidence to sustain the finding of the jury that he was capable of forming a design deliberately and premeditatedly to kill. Voluntary drunkenness is no legal excuse for a crime perpetrated under the influence of intoxicating liquor unless its effect is to destroy the ability of the accused to form a specific intent, the existence of which is an element of the offense charged. The undisputed evidence disclosed by this record shows a deliberate and intentional killing by one who not only was capable of

34

forming an intent to kill, but who in fact gave expression to the formation of that intent."

The quoted language is fully applicable to the case at bar. Second. *Did the trial court err in admitting the statements made by the deceased to the witness Rounsavell in which she said, "That is my husband. He is drunk. He is trying to kill me."?*

This question is answered in the negative. These exclamations were made by deceased immediately after the defendant ran her down with his automobile in City Park. They were not made pursuant to any questions asked by the witness. They were made as the defendant was speeding away from the scene at the park. In admitting the evidence the trial court said, "I will rule it is a part of the res gestae." In *Abeyta v. Denver,* 132 Colo. 472, 289 P.2d 918, this court held that a statement made under circumstances similar to those under discussion here was properly received as part of the res gestae. It was said in *Abeyta* that the statement made to a witness by the victim to the effect that, "He [the defendant] cut me" was made

"very shortly after the attack on Mary, during the period of heat, excitement, anxiety and confusion. They fall squarely within the elements of res gestae as laid down in *Graves v. People,* 18 Colo. 170, 32 Pac. 63, which is still the law in Colorado."

In *Abeyta* this court approved the often quoted rule that, "Whether specific acts are admissible as part of the res gestae is a matter within the sound discretion of the trial court, the determination of which is ordinarily conclusive on appeal, in the absence of a clear abuse of discretion."

No abuse of discretion has been shown in the instant case. Third. *Did the trial court err in admitting statements made by the deceased while in the emergency room at the hospital in which she identified the defendant as the person who shot her?*

This question is answered in the negative. It is

sufficient answer to the objections made to admission of this testimony to quote from *Reppin v. People,* 95 Colo. 192, 34 P.2d 71, the following language:

"To make a dying declaration admissible in evidence it is not necessary that the declarant should have stated at the time that it was made under a sense of impending death. The law is thus stated in 1 Greenleaf on Evidence (16th Ed.) section 158: 'It is enough if it satisfactorily appears, in any mode, that they were made under that sanction; whether it be directly proved by the express language of the declarant, or be inferred from his evident danger * * *'."

The full circumstances surrounding the making of the statements by deceased amply supply the prerequisites to the admission of a dying declaration as set forth in C.R.S. 1963, 52-1-20.

Fourth. *Did the trial court err in refusing to appoint a psychiatrist to be selected by defendant following the reports made by three psychiatrists who had theretofore been appointed by the court?*

We answer this question in the negative. The record indicates that the defendant, after tendering his plea of not guilty by reason of insanity, was examined by three psychiatrists who submitted their reports to the court stating that in their opinion the defendant was sane at the time of the commission of the crime. Defendant filed his motion for the appointment of a psychiatrist of his own choosing before his insanity plea was withdrawn. This motion was denied. Thereafter the defendant withdrew his insanity plea.

There is no statutory authority or judicial precedent compelling appointment of expert witnesses on behalf of a defendant at state expense. Whether such an appointment should be made is at best a discretionary matter for determination by the trial court. No facts are established by the record on error which reveal an abuse of discretion. All we find in the record is a request and a denial by the court. We find no showing at that hearing

of necessity and prejudice or possible prejudice to the defendant upon a failure to appoint. Furthermore, we note that two of the psychiatrists who examined the defendant under the court order stated in their reports that, in their opinion, there would be some question over whether, due to drunkenness, the defendant had the ability to form the specific intent to murder. The defendant could have called these doctors as his own witnesses to reinforce his contention that he was unable, due to drunkenness or mental disorder short of legal insanity, to form the specific intent to commit murder in the first degree. He was aware of their diagnosis. We hold, therefore, that he can claim no prejudice by virtue of the trial court's ruling in the case at bar.

Other assignments of error are either disposed of by the foregoing or are manifestly without merit and require no extended comment. In the last mentioned category are the contentions that venue was not established; that there was misconduct of the district attorney in asking a question which resulted in an objection which was sustained; and that pre-trial publicity prevented a fair trial.

The record is devoid of prejudicial error.

The judgment is affirmed.

MR. JUSTICE LEE not participating.