## No. 26258

## The People of the State of Colorado v. Sherman Ramon McCrary
### (549 P.2d 1320)

Decided May 17, 1976.                    Rehearing denied June 7, 1976.

John P. Moore, Attorney General, John E. Bush, Deputy, Gregory L. Williams, Assistant, for plaintiff-appellee.

Myers, Woodford & Hoppin, Frederick J. Myers, for defendant-appellant.

*En Banc.*

MR. JUSTICE HODGES delivered the opinion of the Court.

Defendant McCrary was convicted by a jury of kidnapping[1] and first-degree murder[2] in connection with the robbery at a donut shop and the subsequent abduction and killing of the waitress, Leora Rose Looney. He was given a life sentence on the murder charge[3] and a consecutive sentence of 29-30 years[4] on the kidnapping charge. He appeals and urges reversal of the trial court's judgments of conviction on the basis of several alleged errors by the trial court.

The defendant contends that the trial court erred (1) by denying his motion for change of venue on account of prejudicial pretrial publicity, (2) by denying his motion to appoint a public opinion pollster at state expense to determine the effect of pretrial publicity, (3) by failing to dismiss several jurors for cause because of their exposure to pretrial publicity, (4) by failing to suppress certain post-indictment statements made by him to the police, (5) by refusing to grant a severance of the charges against him, (6) by not ordering a mistrial as a result of the prosecuting attorney's improper reference to "rape" in his closing arguments before the jury, (7) by failing to direct a verdict of acquittal when the facts failed to support a felony-murder, and (8) by admitting into evidence an allegedly inflammatory, non-probative picture of the strangulation marks on the victim's neck.

These foregoing contentions have been ably argued and thoroughly briefed by both defense counsel and the People. We conclude that no reversible error exists in the trial court's resolution of these issues and we therefore affirm the trial court's judgments.

There follows a resume of the facts surrounding the crimes and other factors pertinent in the consideration of the issues posed on this appeal. On the evening of August 20, 1971, Miss Looney was reported missing from a donut shop in Lakewood, Colorado where she was employed. The report was made when the donut shop was found to be unattended. It was noted also that Miss Looney's purse was left open and that her car remained parked near the shop. The cash register drawer was open and approximately $100 had been taken therefrom. Several persons, later called as witnesses, reported seeing two men in the donut shop just prior to Miss Looney's disappearance. They identified these men as defendant McCrary and his son-in-law Carl Taylor. One of the witnesses also placed Carl Taylor at the cash register when he waited on a customer who had purchased some donuts. Three days later, Miss Looney's nude body was found in a

---

[1]C.R.S. 1963, 40-2-44.

[2]C.R.S. 1963, 40-2-3(1).

[3]At the time of defendant's trial, the death penalty had not been restored to comply with the U. S. Supreme Court's ruling in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

[4]C.R.S. 1963, 40-2-45(4).

remote field in Weld County. She had been shot twice from close range, and her neck showed signs of strangulation.

Over a year later, on November 14, 1972, the defendant, his wife, and Carl Taylor were indicted by a Jefferson County grand jury for the kidnapping and murder of Leora Rose Looney. Two days later, while in a California jail where he was serving a sentence on an unrelated charge, the defendant made certain inculpatory statements to Colorado officers. These statements were later admitted at trial.

In these statements, defendant McCrary related the following account of the day of the murder. He and Taylor had driven down to Denver from a motel in Cheyenne, Wyoming, where his family was staying, to "look for a place to rob or highjack." After several hours of drinking and not finding a suitable place to rob, he and Taylor went into the donut shop for a cup of coffee. When they started to leave, Taylor went back in "to get something else." Defendant then realized the gun was missing from the car and he "knew what was happening." In a few minutes, Taylor motioned for defendant McCrary to drive the car around back where he forced Miss Looney into the car and he handed the defendant a donut sack of money. They then headed back to Cheyenne using back roads. They stopped for 20 or 30 minutes so that defendant could get something to drink because Taylor had "done got [him] scared up." After getting into the car again, defendant asked Taylor what he was going to do with the girl, to which Taylor replied that he was "going to take her out of town thereaways and tie her up" and before "she can get back to town, well, we'll be gone." A police car pulled up alongside them and a police officer looked over at them. They then drove onto a side road into a field. Defendant got out of the car to see if there were any houses nearby. The waitress did not want him to leave because, while he was in the bar, "Carl had made a few passes at her or messing (sic) with her or something." McCrary had previously warned Taylor "to keep his hands off of her." While defendant was gone, he heard several shots and returned to the car. After telling Taylor that some houses were possibly nearby, Taylor dragged the girl's body off the road, and they resumed their trip back to Cheyenne.

Both defendant McCrary and Taylor were returned to Colorado from California to stand trial after they had waived extradition. The case received considerable publicity because of the nature of the crimes. As a result of pretrial discovery and extensive hearings on defendant's various pretrial motions, the trial court ruled that evidence of other alleged similar transactions would be inadmissible at trial; that a change of venue was unnecessary; and that defendant McCrary's statements would be admissible. Before the commencement of trial, defendant McCrary's wife entered a plea of guilty to the charge of accessory after the fact to murder. The trial of defendant and Taylor was severed during voir dire of the jurors, and it

proceeded against McCrary individually on both charges.

## I.

At the pretrial hearing on the defendant's motion for a change of venue, the trial court considered numerous affidavits from various citizens in the community and heard testimony from defense attorneys and newsmen as to whether or not defendant could receive a fair trial despite the pretrial publicity. Many newspaper clippings and broadcast transcripts were presented. A few of the stories mentioned the itinerant life-style of the McCrary family, their possible connection with crimes in other states, and the possible rape of Miss Looney. Defense counsel specially drew attention to a story which indicated that the McCrarys may have been connected with as many as 22 murders across the country, and to a story which reprinted a California probation report which gave unfavorable personality profiles of the McCrary family.

The trial court denied the motion for change of venue after making extensive findings of fact upon which it based its conclusions that there was not the massive, pervasive and prejudicial publicity as was evidenced in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) and *Walker v. People*, 169 Colo. 467, 458 P.2d 238 (1969), so "as to create a contamination of the residents of Jefferson County such as to render it impossible for the defendant to obtain a fair and impartial trial."

Defendant argues that the trial court applied an overly stringent standard for determining whether a change of venue should be granted, and also misconceived the extent and prejudicial quality of the pre-trial publicity. As to the former argument, defendant contends that the trial court abused its discretion by requiring the defendant to demonstrate the "massive, pervasive and prejudicial publicity" as in *Sheppard* and *Walker* since a venue change should be a prophylactic measure to prevent an unfair trial from occurring as in those cases. Also, he alleges the court erred by requiring the defendant to show that such publicity made a fair trial "impossible" as opposed to just proving that a "reasonable likelihood" existed that a fair trial could not be had.[5]

It is true that a trial judge has much discretion to order a change of venue upon a showing of widespread pretrial publicity and may find it prudent to do so in order to facilitate the process of voir dire, especially when no hardship is thereby imposed on the witnesses.[6] We have generally held, however, that this court will not reverse a denial of a

---

[5]The court in *Sheppard* stated that "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." 384 U.S. at 333.

[6]35 witnesses were endorsed on the defendant's indictment.

change of venue by reason of pretrial publicity unless the defendant can demonstrate that the publicity had an actual adverse effect upon the jury panel or portion thereof. *See, e.g., Sergent v. People*, 177 Colo. 354, 497 P.2d 983 (1972); *Small v. People*, 173 Colo. 304, 479 P.2d 386 (1970). In rare cases, a denial of a change of venue will also be reversed upon a showing of "massive, pervasive and prejudicial publicity" where a denial of a fair trial could have been "presumed," or, in other words, where a reasonable likelihood existed that a fair trial could not be had. *See, e.g., Sheppard, supra*, and *Walker, supra*.

The constitutional standard of fairness requires that a defendant have a panel of impartial and unbiased jurors. However, an important criminal case can be expected to generate much public interest and usually the best qualified jurors will have heard or read something about the case. To hold that jurors can have no familiarity through the news media with the facts of the case is to establish an impossible standard in a nation that nurtures freedom of the press. It is therefore sufficient if jurors can lay aside the information and opinions they have received through pretrial publicity. *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Only when the publicity is so ubiquitous and vituperative that most jurors in a community could not ignore its influence is a change of venue required before voir dire examination.

Some of the cumulative factors to be considered by a trial court in determining whether there is such massive, pervasive and prejudicial pretrial publicity as to bias a community are: the size and type of the locale, the reputation of the victim, the revealed sources of the news stories, the specificity of the accounts of certain facts, the volume and intensity of the coverage, the extent of comment by the news reports on the facts of the case, the manner of presentation, the proximity to the time of trial, and the publication of highly incriminating facts not admissible at trial.

The trial court therefore did not abuse its discretion by requiring defendant McCrary to show that massive, pervasive and prejudicial publicity preceded his trial before granting him a venue change, in the absence of a showing of an actual nexus between the jury panel and the publicity. Moreover, from an overview of its findings and the context within which the trial court made its conclusions of law, we do not believe that it imposed a stricter test than the one established by this court. The record clearly supports a ruling that no extensive publicity existed as to raise a presumption or reasonable likelihood of a biased jury.

The trial court found that the bulk of news media coverage was carried at the time of the murder over one and one-half years before and at the time the defendant was indicted over six months before; that very few stories of the case were carried on the front pages or in lead headlines of the newspapers; that no editorial comments had been made imputing the

guilt or innocence of the defendant; that many of the witnesses and affiants were of the opinion that defendant could receive a fair trial in the community; and that little coverage of the pretrial hearings existed. The time lag between the publicity and trial date, the small proportion of potentially prejudicial news stories, and the lack of comments on defendant's guilt or innocence, convinces us that the trial court did not abuse its discretion in denying a change of venue.

■ In addition, our review of the voir dire examination of the prospective jurors as a whole does not indicate such a nexus between the publicity and the jury panel that a change of venue should have been granted. *See Corbett v. People*, 153 Colo. 457, 387 P.2d 409 (1963). We cannot conclude that such a substantial portion of the jury panel was affected by the pretrial publicity so as to raise a presumption of bias of all the jurors. The fact that only eight out of the one hundred jurors impanelled stated that they had not heard or read about the case, does not automatically mean that the rest of the jurors could not be fair and impartial jurors capable of casting aside any preconceived opinions or knowledge of the case. Also, the fact that of the 68 jurors individually questioned, 13 were dismissed for cause on defendant's motion, and 15 were dismissed by the court *sua sponte*, does not demonstrate of itself a situation where it must be concluded that it would be improbable that a fair and impartial jury could be selected from the panel as a whole.[7]

Finally, the examination portrayed no community-wide prejudice or resentment against the defendant, and the trial court, in our view, was able to impanel a fair and impartial jury.

## II.

■ Defendant also contends that he was denied due process of law and equal protection of the laws because the trial court denied his motion to appoint a public opinion pollster at state expense to determine the extent of the pretrial publicity. The trial court ruled that there was no showing of the necessity for or right to a state financed pollster in this case. We agree with this ruling.

Assuming arguendo that the court had the constitutional responsibility[8] or statutory authority[9] to appoint such an expert in this case, the de-

---

[7]The Supreme Court in *Murphy v. Florida, supra*, noted that although 20 of the 78 veniremen in that case indicated an opinion as to the defendant's guilt, it by no means suggested a community with sentiment so poisoned as to impeach the indifference of other jurors. By comparison, the Court noted that in *Irvin v. Dowd*, 90% of those examined were inclined to believe in defendant's guilt, and the court excused 268 out of 430 veniremen for cause.

[8]*Compare United States ex rel. Smith v. Baldi*, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1953) with *Mayer v. Chicago*, 404 U.S. 189, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971), *Britt v. North Carolina*, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971); and *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). *See also* Margolin & Wagner, *The Indigent Criminal Defendant and Defense Services; A Search for Constitutional Standards*, 24 *Hastings L.J.* 647 (1973).

[9]*See Brown v. District Court*, 189 Colo. 469, 541 P.2d 1248 (1975). *Compare Dolan v. People*, 168 Colo. 19, 449 P.2d 828 (1969).

fendant has nevertheless failed to demonstrate any particularized and reasonable need for the appointment of the pollster by showing that no other alternatives existed or that the polls had a distinct value to his defense. *See Medina v. District Court*, 189 Colo. 516, 543 P.2d 62 (1975); *Brown v. District Court*, 189 Colo. 469, 541 P.2d 1248 (1975); and *Sollitt v. District Court*, 180 Colo. 114, 502 P.2d 1108 (1972).

### III.

Defendant also contends that the trial court erroneously refused to dismiss several jurors for cause who were exposed to prejudicial pretrial publicity. As a result, he maintains that he was forced to dismiss the jurors with his preemptory challenges and was consequently unable to dismiss four of the actual jurors whom he had also challenged for cause and against whom he unsuccessfully requested more preemptory challenges.[10] After reviewing the transcripts of the eight-day voir dire which involved painstaking questioning and sequestering of each potential juror, we cannot agree that the trial court abused its discretion in denying the disputed challenges for cause. The record does not show that these jurors possessed such highly inflammatory knowledge of the case that they could not consider defendant's guilt or innocence on the evidence presented at the trial alone.

As we discussed earlier, the fact that jurors have read newspaper articles relating to a case does not disqualify them as jurors. *See also Kurtz v. People*, 177 Colo. 306, 494 P.2d 97 (1972). This is true even though a juror may have had a preconceived notion as to the guilt or innocence of the accused. It is sufficient if the juror can lay aside his opinion or extrajudicial information so that he can render a verdict based on the evidence presented in court.

Nevertheless, a juror's assurances that he is equal to the task cannot be dispositive, and it is the duty of the trial court to determine the competence and credibility of the juror. The test is whether the nature and strength of the opinion formed or of the information learned from pretrial publicity are such as necessarily raise the presumption of partiality or of the inability of the potential juror to block out the information from his consideration. This question is essentially one of fact which lies within the sound discretion of the trial court and its decision will not be overturned on appeal unless an error is manifest. *Cf. Irvin v. Dowd, supra.* It is the trial court which hears the questions put to the juror and the answers given, observes the juror's demeanor while being questioned, and discerns

---

[10]Under these circumstances, *People v. Silvola,* 190 Colo. 363, 547 P.2d 1283, gives defendant standing to challenge the court's denial of his challenges for cause.

the truthfulness, the sincerity, and the dedication to the high responsibility involved in being a fair and impartial juror. *See Leick v. People*, 136 Colo. 535, 322 P.2d 674 (1958).

The defendant correctly argues that a juror's exposure to highly inflammatory information that is inadmissible at trial can, in some cases, be sufficient to disbelieve a juror's assurances that he can lay it aside. However, normally other factors must also be considered such as the detail of the information, the strength of the juror's recollection, the length of time since his exposure to the information, the juror's willingness to exclude the evidence from his consideration, the juror's opinion as to its relevance, the confidence the juror expresses in the news source, and finally, the atmosphere that will pervade the trial.

Applying these criteria, we have found no abuse of discretion in the trial court's denial of defendant's challenges for cause.

IV.

The defendant next argues that the trial court erred by failing to suppress certain statements made by him to the police. On November 4, 1972, two Colorado officers went to California, where defendant McCrary was serving a sentence on an unrelated charge, to interview him concerning his involvement in the donut shop murder and robbery. At the same time, but not by common design, two Texas officers arrived. The Texas officers interviewed defendant McCrary first about his involvement in crimes committed in Texas. The Colorado officers, who were in the adjoining room and who could overhear part of the interview, testified at the suppression hearing that defendant was advised of his rights and he chose to remain silent. Nevertheless, they stated that the Texans continued to question him and told him that his wife would not be able to withstand similar questioning and that the defendant might lose his life in Texas if he did not cooperate. The defendant did not make any statements to the Texas officers during this three hour session, and in fact, according to the Colorado officers, was at times as testy as the Texas officers.

After the Texans finished their interview, the Colorado officers attempted to question the defendant. After being advised of his rights, the defendant chose to remain silent and the Colorado officers terminated their questioning. On November 10, 1971, the Texas officers conducted another interview with a California officer monitoring their questioning. As before, the defendant did not make any statement to them. On November 16, 1971, the Colorado officers again met with the defendant and advised him of his rights. Defendant made statements to the officers concerning his participation in the Looney murder. These statements were recorded on tape.

The defendant now contends that the statements to the Colorado officers were coerced by the Texas officers' threats on his life and to his wife's mental health. Also, the defendant now states that he felt compelled

to waive extradition to Colorado rather than face extradition to Texas and that was why he made statements to the Colorado officers. The trial court, however, found that the statements were voluntary beyond a reasonable doubt.[11] It also found that *Miranda* warnings were given before and during the interview. We hold that there is sufficient evidence to support these findings.

The record does not compel a finding, as a matter of law, that the statements are coerced or tainted by the alleged threats of the Texas officers. Defendant's belated apprehension of his possible fate in Texas does not square with his knowledge at the time of his statements that he and his family had already been indicted and extradition proceedings begun to return him to Colorado instead of Texas. Rather, defendant's statements were the likely result of his desire "to clear up the situation" and were given after a voluntary and deliberate appraisal of the "best deal" he could manage for his family. Defendant never appeared to cower to the taunts of the Texas officers as evidenced by his steadfast refusal to make a statement to them and his belligerent remarks to them. The statements to the Colorado officers were a full 12 days after the initial questioning by the Texans. The Colorado officers never participated in the tactics of the Texas officers, and, in fact, defendant admitted that he felt comfortable around them. These circumstances suggest in a rather strong way that defendant McCrary's statements were voluntary and the product of his free will. The foregoing factors, in addition to the *Miranda* warnings to this defendant, also fortify a finding that the taint of any illegal questioning by the Texas officers was removed. *See Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) and *People v. Corbett,* 190 Colo. 388, 547 P.2d 1264 (1976).

■ Defendant also contends that he was not fully advised of his rights inasmuch as he was not expressly told that he could terminate the questioning at any time. He was, however, fully advised of his right to remain silent and his right to an attorney at state expense if necessary, and was told that whatever he might say could be used against him. He, nevertheless, expressly waived these rights in writing. Such an advisement comports with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and our decision in *People v. Gilmer*, 182 Colo. 96, 511 P.2d 494 (1973).

■ Defendant also argues that his statements should be suppressed under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *McLeod v. Ohio*, 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965), summarily reversing *State v. McLeod*, 1 Ohio St.

---

[11] The trial court did not have the benefit of our opinion in *People v. Shearer*, 181 Colo. 237, 508 P.2d 1249 (1973), in which we held that voluntariness need only be shown by a "preponderance of the evidence."

2d 60, 203 N.E.2d 349 (1964), because they were made in response to police questioning after his indictment and without the presence of counsel.

In *Massiah*, the United States Supreme Court held that the deliberate, surreptitious elicitation of incriminating statements from *Massiah* by a government undercover agent after he had been indicted, had retained an attorney, and had been arraigned on the charges, violated his Sixth Amendment right to counsel. In *McLeod*, the Court summarily reversed an Ohio Supreme Court opinion which admitted statements made by a defendant voluntarily, but without advisement of his *Miranda* rights, to the police while they were in a patrol car looking for the murder weapon after defendant had been indicted for the murder.

We have previously held that *Massiah* and *McLeod* do not require that spontaneous, volunteered statements made by a defendant under indictment be excluded, since the police had not deliberately elicited the statements. *See People v. Spinuzzi*, 184 Colo. 412, 520 P.2d 1043 (1974), and *Olguin v. People*, 179 Colo. 26, 497 P.2d 1254 (1972). We now hold that post-indictment statements by a defendant to identified police officers after he has knowingly and voluntarily waived his right to counsel are also admissible. *Accord, Moore v. Wolff*, 495 F.2d 35 (8th Cir. 1974); *United States v. Hayles*, 471 F.2d 788 (5th Cir. 1973), *cert. denied*, 411 U.S. 969, 93 S.Ct. 2159, 36 L.Ed.2d 690 (1973); *United States v. Crisp*, 435 F.2d 354 (7th Cir. 1970), *cert. denied*, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971); *Arrington v. Maxwell*, 409 F.2d 849 (6th Cir. 1969); *cert. denied*, 396 U.S. 944, 90 S.Ct. 381, 24 L.Ed.2d 245 (1969); *Dillon v. United States*, 391 F.2d 433, (10th Cir. 1968), *cert. denied*, 393 U.S. 889, 89 S.Ct. 208, 21 L.Ed.2d 168 (1968).

*Massiah* and *McLeod* must be read in light of the subsequent decision in *Miranda* which expanded the protections of the Fifth and Sixth Amendment rights beyond formal indictment to the critical stage of custodial interrogation. At the same time, the Supreme Court expressly recognized the validity of a knowing and voluntary waiver of these rights. Today, *Massiah* and *McLeod* therefore stand only for the proposition that police cannot deliberately acquire information from a suspect under surreptitious circumstances which prevent his effective exercise or waiver of his rights to counsel at a time when those rights have clearly attached after indictment.

In this case, defendant McCrary expressly waived his right to the assistance of counsel. The trial court found after a full hearing that the defendant had been advised of his recent indictment in Colorado and of Colorado's attempt to extradite him on those charges. Defendant was warned of the consequences of any statement he might make and that any such statement could be used against him. Nevertheless, he freely and knowingly gave statements to the Colorado police officers who were known by him to be Colorado police officers. Under these circumstances, he effec-

tively waived his right to counsel and the trial court therefore properly ruled that his statements were admissible at trial.

## V.

Defendant's next assignment of error relates to the trial court's denial of his request to be tried separately on the charges of kidnapping and felony murder. The joinder of the two charges, he alleges, placed an impermissible chilling effect on his constitutional right to remain silent on the kidnapping charge and his right to testify in his own defense on the other charge of felony murder. He contends that his testimony would have been exculpatory on the murder charge and would have tended to show that he did not know that Taylor was going to shoot the girl. On the other hand, the defense counsel asserts that the defendant did not testify at the joint trial, since his statement indicated that he was there with Taylor when the girl was kidnapped.

Crim. P. 8(a), in effect at the time of this prosecution, allowed the prosecution to join all offenses "based on the same act or transaction."[12] Crim. P. 14 provides that the trial judge "may" order the severance of offenses if it appears that the defendant or the prosecution would be prejudiced otherwise. The denial of a severance under Crim. P. 14 is therefore not a matter of right but rather lies within the sound discretion of the trial court. *People v. Walker*, 189 Colo. 545, 542 P.2d 1283, (1975). We hold that the trial court did not abuse its discretion.

In support of his position, defendant relies heavily on *Cross v. United States*, 335 F.2d 987 (D.C. Cir. 1964) and the *ABA Standards for Criminal Justice, Joinder and Severance*, § 2.2, that state that prejudice can exist when offenses of *similar character* are joined and defendant wishes to testify on one but not the other. However, this reliance is misplaced, since the instant case involves the joinder of offenses arising out of the same transaction. Even the District of Columbia Circuit has later recognized that joinder of offenses arising from the same occurrence does not present the same potential for prejudice inherent in other types of joinder. *See, e.g., Baker v. United States*, 401 F.2d 958 (D.C. Cir. 1968) and *Bradley v. United States*, 433 F.2d 1113 (D.C. Cir. 1969). *See also United States v. Lee*, 428 F.2d 917 (6th Cir. 1970).

In joinder of offenses of similar character, prejudice may develop because defendant's statements concerning his involvement in one count would not ordinarily be admissible at a separate trial of the second count, since it is related to the other count only as a crime of a similar nature. However, where two counts arise out of the same occurrence, as here, the defendant's statements made at a separate trial would ordinarily be admissible at the second trial as an admission. Hence, in a joint trial of of-

---

[12]Crim. P. 8(a) now requires such joinder of offenses.

fenses arising from the same occurrence, the alleged prejudice to the defendant can only be speculative since the defendant would have to be tried first on the offense for which he did not want to take the stand. *Cf.* Note, 74 Yale L.J. 553 at 561 (1965). On the other hand, the countervailing goals of judicial economy and efficiency which are served by insuring that a given transaction need only be proved once are most persuasive.

In *People v. Walker, supra,* we held that the prejudice, if any, that could ever result from defendant's being required to testify to events pertaining to both counts, when the counts arise from the same *res gestae,* must be demonstrated by a "convincing showing" that he has both important testimony to give concerning one count and a strong need to refrain from testifying on the other. This defendant has failed to do this. In his memorandum in support of his motion for severance, for example, defense counsel alleges generally that the defendant "will probably want to testify on the murder charge" though he could not guarantee what the defendant would decide in this regard. Defendant does not allege that a separate trial on the felony murder charge would have preceded the trial on the other count or that he had a right to that ordering of the trials. Consequently, whether defendant would have testified at a separate trial is conjectural at best. Moreover, defense counsel's argument in his appellate brief that defendant needed to testify as to his knowledge that Taylor would shoot the girl is largely irrelevant on a felony murder charge given defendant's own statements that implicated him as a principal in the underlying robbery and that indicated he was with Taylor when he kidnapped the girl to effectuate their robbery.

## VI.

Defendant cites error in the judge's refusal to declare a mistrial after the prosecuting attorney referred to the possible "rape" of Miss Looney in his closing statements to the jury. While the remarks were not proper, they, nevertheless, do not constitute grounds for mistrial. Sexual molestation was evidenced by McCrary's own statement and by the fact that Miss Looney's body was found nude. *Bizup v. People,* 150 Colo. 214, 371 P.2d 786 (1962); *Leick v. People,* 136 Colo. 535, 322 P.2d 674 (1958).

## VII.

Defendant also argues that the evidence was insufficient to convict him of felony murder.[13] He argues that the felony murder doctrine should not be extended to include killings occurring during escapes from the un-

---

[13]C.R.S. 1963, 40-2-3(1): "All murder . . . which is committed in the perpetration or attempt to perpetrate any arson, rape, robbery, mayhem, or burglary . . . shall be deemed murder of the first degree. . . ."

derlying felony. Alternatively, he argues that it should be confined only to murder committed during the immediate flight from the scene of the crime, but not, where as here, the killing occurs sometime later at a remote place and after the intervening sexual molestation of the victim.

We have held that escape from the scene of the underlying felony is part of the *res gestae* of a crime so that a murder committed to facilitate the flight can be felony murder. *Whitman v. People*, 161 Colo. 110, 420 P.2d 416 (1966); *Bizup v. People*, 150 Colo. 214, 371 P.2d 786 (1962). This rule appears to be supported by the vast majority of cases in other jurisdictions. *See* generally, Anno., *Felony Murder Rule - Termination of Felony*, 58 A.L.R. 3d 851, § 6.

In *Bizup*, this court held that the felony murder doctrine applied where a taxi driver was robbed and the defendant forced him to take a side road where he shot him. The following statement in *Bizup* is applicable here:

"The robbery and the killing which followed were all part of the same transaction. They were so closely connected in point of time, place and continuity of action as to be one continuous transaction. All of the defendant's acts from the time he took the money until he cold bloodedly shot his victim were one continuous integrated attempt to successfully complete his crime and escape detention."

There can be no exact measure of time or distance which is dispositive of whether felony murder exists. In this case, the evidence, when viewed in the light most favorable to the prosecution, establishes that the killing of Miss Looney was a continuous, integrated attempt by the defendant and Taylor to escape detection by eliminating the key eyewitness to their robbery. They were en route from the scene of the robbery and were seeking to reach a sanctuary in Cheyenne. The defendant himself stated that the purpose of taking the girl to the isolated field was to prevent her from alerting authorities too soon. The use of the side roads and the close brush with the police cruiser evince the robbers' fear of imminent detection. The twenty or thirty minute pause at a bar, if believed, could have been interpreted by the jury as a furtherance of the scheme by boosting the courage of the robbers. Finally, the jury could have properly determined that the asserted sexual molestation of the victim was only incidental to the primary purpose of escaping detection from the robbery. The evidence was therefore sufficient to convict defendant of felony murder. Compare the similar rulings on comparable facts in *People v. Chapman*, 261 Cal. App.2d 149, 67 Cal. Rptr. 601 (1963) and *State v. Fouquette*, 67 Nev. 505, 221 P.2d 404 (1950).

## VIII.

Finally, the defendant urges that the trial court erred by admitting into evidence a photograph of the strangulation marks on the victim's neck. We have held that when photographs are tied to the commission of

the crime and have probative value, the fact that they tend to inflame cannot rule out their admissibility. *People v. Pearson,* 190 Colo. 313, 546 P.2d 1259 (1976); *People v. Strohm,* 185 Colo. 260, 523 P.2d 973 (1974); *People v. Lowe,* 184 Colo. 182, 519 P.2d 344 (1974). Only when the inflammatory nature of the photographs far outweighs their probative value would admissibility be properly refused. *People v. Pearson, supra.*

The photograph in question was clearly probative. Its inflammatory nature, if any, was mostly eliminated when the trial judge carefully excised those portions of the photograph which showed the victim's face. The resulting picture only showed a close-up of the marks on the neck. It was blurry, and the strangulation marks were difficult to discern. We find no error in the admission into evidence of this photograph.

The judgments of conviction of this defendant on both kidnapping and first-degree murder (felony murder) are affirmed.

MR. JUSTICE ERICKSON concurs in result only.